PLAQUEMINES TROPICAL FRUIT COMPANY

v.

CHARLES C. BUCK et al.

1. B. agreed to purchase of W. a tract of land of about twenty-eight thousand acres, in the State of Louisiana, for $25,000, to be paid $5,000 in cash, $10,000 in three months, and $10,000 in stock at par of a company to be

formed for the development of the lands. B. then issued a prospectus, over his own name, for the incorporation of such company and secured the promise of the necessary number of persons and means to comply with the contract. W. then refused to carry out the agreement. B. thereupon organized the company under the laws of New Jersey, and, although not an incorporator, was elected a director and president of the company. A resolution was passed, at the first meeting, to purchase the property for $150,000, to be paid for $120,000 in stock at par, $10,000 in cash, and the balance, $20,000, in notes secured by a mortgage. Certificates for twelve thousand shares in blank were issued and delivered to B. to effect the purchase. B. commenced suit against W. for the specific performance of the contract, which led to an agreement by which W. was to convey four thousand more acres, reserving, for one year, the right to cut willows and to clear the land, and to receive $27,000 instead of $25,000. This agreement was carried out by W. conveying to L., the attorney of B., who gave the notes secured on the property, and L. then conveyed to the company subject to the encumbrances. B. paid W. $5,000 in cash and seven hundred shares of stock. L. gave W. three notes—two for $5,000 each, and one for $10,000. W. gave up one of the $5,000 notes to B., who turned it over to a party who had assisted him in making the bargain. The balance of the twelve thousand shares of stock B. retained and distributed part to the other defendants.

2. The evidence showed that B. alone got up the company, secured the shareholders and selected the incorporators and officers; that he attended the meeting for organization and the first meeting of directors (his presence being necessary for a quorum) at which the purchase was authorized, and the weight of evidence is that he did not, in the hearing of all, disclose his interest in or relation to the property.

3. On a motion to restrain B. and the other defendants from parting with such stock and from voting thereon—*Held*, (1) no rights, legal or equitable, arise in favor of a corporation in respect of transactions, whether complete or inchoate, merely because entered into in contemplation of the creation of such corporation; (2) that it was open to B. to buy the property on his own account, for any price he could, with the intention, or in the hope of selling it, at a higher price, to a company to be formed, and, dealing independently, to sell it for such higher price to such company, so long as he did so fairly; (3) under the facts, as shown by the affidavits, B. must be considered as having made the original contract, not for himself, but on account of the company, and cannot be permitted to retain any increase in the price; (4) that even if the original contract had been made by B. on his own account, the actual purchase or second agreement was made by B. when he was, in fact, the agent of the company and its trustee, and as such liable to account for any profit made by him; (5) that B. was the sole promoter of the company, and as such it was incumbent on him, if he wished to sell to it property of his own, to make full and fair disclosure of his interest and position with respect to that property, and to furnish it with a board of directors capable of forming a competent and impartial judgment as to the wisdom of the purchase and the price to be

paid, and not having done so he cannot retain any profit which he has made out of the company; (6) that an injunction should issue to restrain defendants from parting with stock issued to them or voting thereon, until the final hearing of the cause.

On order to show cause.

*Mr. Edward A. Armstrong* and *Mr. J. S. Lemon* (of the Baltimore bar), for the complainant.

*Mr. Charles V. D. Joline* and *Mr. Thomas E. French,* for the defendants.

GREEN, V. C.

This bill is filed by the complainant, a corporation organized under the laws of this state, to compel the surrender, for cancellation, of certain shares of its capital stock, alleged to have been improperly issued to and held by the defendants, and to restrain the defendants as stockholders, representing such stock, from holding a stockholders' meeting and voting upon said shares, and for an account by the defendant Buck.

On filing the bill and affidavits, an order to show cause why an injunction should not issue, in accordance with the prayer of the bill, was granted, with an *ad interim* order restraining the defendant Buck from transferring any of said shares standing in his name, or voting upon the same at any meeting, except to adjourn the meeting from time to time, and restraining the other defendants from transferring any of the shares in their names until the further order of the court.

On the hearing of the order to show cause, defendants presented their answer and affidavits, and an order was made under the one hundred and twenty-second rule for taking additional affidavits, which were taken on notice.

The question now involved is whether the defendants shall be restrained from transferring the stock standing in their names, or voting on said stock, until the final hearing of the cause.

According to the answer of Charles C. Buck, he was introduced, in June, 1891, by Mrs. Annie E. Diffenderfer, to Abner

H. Jones, as an agent of Robert M. White, who claimed to be the owner of lands in Louisiana.

It appears by Jones' affidavit annexed to the answer, that previous to July 11th, 1891, he had been employed by White to sell the tract of land said to contain twenty-eight thousand acres; that having found a purchaser therefor, White made some changes in the purchase-price; that he (Jones) attached the land for the difference between the price at which White had agreed to sell to him and the price at which he had found a purchaser; that White afterwards put the property in his (Jones') hands to sell again, with the understanding that no one else should attempt to sell the property, and on this agreement he (Jones) released the attachment. Under these circumstances he made an agreement, July 11th, 1891, with Buck, authorizing Buck to make the purchase direct from White, at such price as he could, and that Buck should pay Jones, for this privilege, the sum of $20,000—$10,000 in stock at par, $5,000 in cash at six months and $5,000 in eight months.

On the same day an agreement was made between White and Buck, by which White, claiming to be seized and possessed of certain lands in Plaquemines parish, Louisiana, described therein, agreed to sell the same to Buck upon the payment of $5,000 in cash and the issue of $10,000 par value of the stock in a company to be formed for the development of said lands, and a further payment of $10,000 three months after the date of the transfer by good and sufficient title, White warranting that he would execute such full and complete transfers of the property as would secure to Buck or his assigns peaceable and quiet possession of the same, with this provision:

"Said party of the first part [White] further agrees to make such statement of the consideration in the deed of transfer as shall be deemed necessary by the party of the second part for the proper formation of the company,"

which agreement was signed by the parties and attested by A. H. Jones and J. A. Jones.

After making this agreement with White, Buck returned to Baltimore and then agreed to transfer to Mrs. Annie E. Diffen-

derfer, who had introduced him to Jones, $5,000 par value of the stock of the company to be formed, and thereupon set about securing parties to join him in the incorporation of a company. He issued a prospectus of the Plaquemines Tropical Fruit Company, to be organized under the laws of Maryland, with a capital stock of $250,000, divided into twenty-five thousand shares, of the par value of $10, stating the objects of the corporation substantially to be the purchase of a large tract of land in Louisiana and its cultivation and improvement, describing the situation of the property and the fertility and productiveness of the soil. To the said prospectus maps were annexed, on which were delineated the " proposed purchase of the Plaquemines Tropical Fruit Co." It states that the title to the tract is incontestable; that as late as November, 1890, the supreme court of Louisiana had affirmed that the only title to the land was vested in the grantor in the sale to the company. Having secured the promises of a sufficient number of incorporators, with the requisite capital, Buck returned to New Orleans and requested White to convey the land to him. White refused to do so on the terms named and Buck returned to Baltimore. He then resumed his effort to organize a company, which was consummated under the laws of this state by the incorporation of the Plaquemines Tropical Fruit Company, the complainant herein. The certificate of organization is dated October 30th, 1891; the capital stock is $250,000, divided into twenty-five thousand shares, of the par value of $10; the amount with which the company would commence business is fixed at $1,000. The names and residences of the stockholders and the number of shares held by each are stated to be as follows :

| | | | |
|---|---|---|---|
| James Lynah, | Baltimore, Maryland................ ......50 shares. |
| R. E. Diffenderfer, | " | " | .. ....................10 " |
| E. D. Morrison, | " | " | ........................40 " |

the certificate being signed by those gentlemen.

A meeting was held to organize the company at 119 Market street, Camden, October 31st, 1891. A waiver of notice of the first meeting, signed by Messrs. Lynah, Diffenderfer and Morrison,

was presented and ordered spread upon the minutes. The meet-. ing was organized by the appointment of R. E. Diffenderfer as chairman and James Lynah as secretary *pro tempore.* Messrs. Lynah and Morrison were appointed a committee to prepare by-laws. It was determined that the number of directors should be seven. The polls were opened and the following persons were elected directors : James Lynah, Charles Collins Buck, R. E. Diffenderfer, James D. Mason, W. P. Clotworthy and F. D. Morrison, each having received a vote of all the stock, namely, one hundred shares.

At this point there is no little confusion as to what was really done. The book of minutes produced is signed by F. D. Morrison, secretary, but Mr. George Reynolds, an attorney in Camden, practicing law in Mr. Voorhees' office, where the meeting was held on the 31st of October, 1891, testified that he acted as secretary of the first meeting—that is, he took the notes of the proceedings. He identifies three papers shown to him as the original drafts of resolutions and minutes, and says, further, that he was the only person who did any writing at that meeting.

Mr. Morrison says that, before they left Mr. Voorhees' office, he put the notes of the meeting made by Reynolds in his pocket and took them home, and for some time did not attempt to write them out. He afterwards had the minutes transcribed by a lady, in an old book which was in his office, intending to have them recopied afterwards in another book, and put the originals in his safe, in an envelope, and afterwards gave them to Mr. Clotworthy.

At this meeting on October 31st, 1891, a resolution was passed which will be hereafter set out. According to Mr. Reynolds' original draft of the proceedings, this resolution to purchase land is entered in the meeting of the stockholders and prior to the adjournment.

In the book of minutes it appears as passed at the directors' meeting, and not as having been passed at the stockholders' meeting. It contains a clause that the board of directors are ordered to carry it into effect, both in the original draft as made by Mr. Reynolds, and in the minutes of the directors as it

Plaquemines Tropical Fruit Co. *v.* Buck.

appears in the book.  It is just possible that it was passed at both meetings, as testified by Dr. Buck, although there is no minute of it in Mr. Reynolds' memorandum of the directors' meeting.  The resolution, as it appears by the original draft, identified by Mr. Reynolds, originally read as follows:

"*Resolved*, That the Co. purchase from Robert M. White 28,000 A. of land more or less, situate at the Jump on the Mississippi, La. for the sum of $150,000 and that the same be paid for in 12,000 shares of stock of Co. ten thousand in cash and balance by three promissory notes of Co. to be secured by a mort. on property of Co., said stock so issued to be marked 'issued for property purchased' and be non-assessable and that the Bd. of Directors are hereby ordered to carry this resolution into effect."

As it now appears, the name of Robert M. White has been erased and the words "Dr. Buck" written over it, the original and correction being all in pencil.  Mr. Reynolds has no recollection of how this alteration was made, and cannot tell in whose handwriting the words "Dr. Buck" are.  He says that on a cursory examination it does not appear to be his, although there may be some similarity in some of the letters.

This resolution, as transcribed in the book of minutes, appears to have been originally copied "that the company purchase from C. C. Buck" &c.  The words "from C. C. Buck" were, however, erased by Mr. Morrison, who made the note at the bottom of the page, "This is an error."

A directors' meeting was held immediately after the stockholders' meeting, at which there were present Messrs. Lynah, Buck, Diffenderfer and Morrison, and Charles Collins Buck was elected president, James Lynah, treasurer, and F. D. Morrison, secretary.

It does not appear by the minutes, nor by the testimony, when or how, prior to this, Buck, Mason or Clotworthy became stockholders; the whole amount of stock, namely, one hundred shares, having been voted at the stockholders' meeting at which Lynah, Diffenderfer and Morrison, the original shareholders, were present.  No one was present at the directors' meeting except the incorporators and Buck and George Reynolds.

At the meeting of the directors Dr. Buck was appointed

15

manager of the company, and the secretary was directed to sign, seal and deliver to Charles C. Buck blank certificates for twelve thousand shares of the capital stock of the company. These certificates were afterwards issued in blank by the secretary signing the same and delivering them to Buck all stamped "issued for property purchased." These certificates varied in amount from eight thousand shares to ten shares, and were complete with the exception of the name of the stockholder and the signature of the president, Dr. Buck, to whom they were delivered, as was the seal of the company. He took them to New Orleans.

It will be remembered that White had refused to carry out his agreement with Buck, and the latter, on his return to New Orleans, commenced suit to enforce the performance of the contract. To prosecute this he employed Charles Louque, Esq., as attorney, agreeing to pay him $500 for his services, $100 in cash and the balance in forty shares of stock. This suit was commenced in the United States circuit court, and subsequently White agreed to convey on Buck's consenting to certain terms; these are called, in Dr. Buck's affidavit, modifications of the agreement. He says that by the new arrangement, White was to convey four thousand acres more of land. The purchase-price was changed from $25,000 to $27,000, and White was to have the right to cut willows for one year. On these terms White agreed to convey on Buck paying the costs of suit. On November 27th, 1891, the agreement was consummated, a settlement of the suit being entered into before a notary public, and the transfer of the title made from White to Charles Louque and by Charles Louque to the company, the conveyances also being dated November 27th, 1891. That from White is for the express consideration of $30,000, therein recited to have been paid as follows: $10,000 cash in United States currency, three promissory notes dated November 27th, 1891, one for $5,000 (marked No. 1), payable three months after date; one for $5,000 (marked No. 2), payable eight months after date, and one for $10,000 (marked No. 3), payable twelve months after date, with interest

at six per cent. from maturity on the first and second, and on the last from date, with this clause:

> "It is hereby distinctly agreed and understood that note No. 2 yields priority of mortgage and takes second rank in favor of note No. 1 for $5,000 and No. 3 for $10,000; it being expressly declared that in order to secure the payment of these notes at maturity the parties agree that the vendor's lien or privilege is retained on the property sold, and that the same remain specially mortgaged and hypothecated in favor of the vendor and of the future holder of the note."

This instrument, having been signed by Robert M. White and Charles Louque before a notary, and certified by him under his official seal, was recorded in the parish of Plaquemines as a conveyance and as a mortgage. The conveyance from Louque to the company is dated November 27th, 1891, and is expressed to be in consideration of the sum of $150,000, to be paid as follows: $10,000 cash, $20,000 by the purchaser assuming to pay, to the discharge of the vendor, three promissory notes, dated November 27th, 1891, drawn by Charles Louque to his own order and by him endorsed, being the three notes referred to in the former conveyance;

> "and for the balance of the purchase-price, $120,000, the purchaser has furnished the like sum of shares·of stock, at par, of the Plaquemines Tropical Fruit Co., and the present vendor acknowledges to have presently received from the present purchaser 12,000 shares of the capital stock of said company, for which receipt is hereby granted."

By the settlement of the suit, it appears that White surrendered to Buck the note No. 2, for $5,000 at eight months, and it was afterwards turned over by Buck to Jones.

By a declaration made by Robert M. White, attested before a notary public, May 23d, 1893, and annexed to the bill, it appears that the actual price paid by Buck for the property was $27,000, paid as follows: seven hundred shares of stock of the par value of $10, taken as $7,000; $5,000 in cash on the day of sale (which was paid); $5,000 three months after date, without interest (which is note No. 1), and $10,000 twelve months after date, with interest (which is note No. 3). He says that all the cash

money that has been paid for this property was the $5,000 cash payment on the day of sale. He says the title reads differently from the above facts, and was thus made to suit Mr. Buck, and that the $5,000 and $10,000 notes of deferred payment were still unpaid at the date of his declaration.

On the same day, November 27th, 1891, the agreement between Buck and Jones was modified so that Jones agreed to accept five hundred shares of the stock of the Plaquemines Tropical Fruit Company, par value $10 each, in lieu of the note payable in eight months from the date of signing the deed, for $5,000, and Buck agreed to sell this said five hundred shares of stock at par within one year from the date of signing the deed.

Certificate No. 6, for five hundred shares, and certificates Nos. 10 and 11, for one hundred shares each, were filled in by Buck, with the name of R. M. White. Certificate No. 1, for eight thousand shares, was filled in with the name of Louque, and by him the same day endorsed in blank by way of assignment, and handed back to Buck, who retained possession of it until November 22d, 1892, when he caused the same to be reissued in smaller certificates, of which he took seven thousand seven hundred shares in his own name, and three hundred shares in the name of F. D. Morrison, who was his brother-in-law and a director and secretary. Certificate No. 2 was filled in as of November 3d, 1891, in the name of Morrison, for forty shares. Certificates Nos. 3, 4 and 5, for five hundred shares each, were filled in with the name of A. H. Jones, and were by Jones assigned back to Buck, and in January and February, 1892, canceled and reissued in Buck's own name. Certificate No. 7 was filled in with the name of Annie E. Diffenderfer. Certificates Nos. 8, 9 and 12 were filled in with the name of Charles Louque and by him assigned and delivered to Buck. Certificate No. 13 for one hundred shares, No. 14 for fifty shares, No. 15 for one hundred shares, No. 16 for five hundred shares, No. 17 for fifty shares, Nos. 18, 19, 20, 21 and 22 each for ten shares, No. 25 for thirty-five shares, were each filled in by Buck with his own name, and certificate No. 25 for twenty-five shares reissued to Morrison, No. 26 for fifteen shares to E. A. Clark. The twelve

Plaquemines Tropical Fruit Co. *v.* Buck.

thousand shares stood on the books of the company, at the time of the filing of the bill, as follows:

"In the name of Charles C. Buck...............................................9,615
        "           "   Charles Louque .......................................  300
        "           "   F. D. Morrison...........................................  435
        "           "   R. M. White..............................................  700
        "           "   Annie E. Diffenderfer.................................  500
        "           "   W. P. Clotworthy. .....................................  300
        "           "   Sarah F. Cowles.........................................   20
        "           "   E. A. Clark................................................   15
        "           "   A. H. Jones.. ...........................................  100
        "           "   H. W. Horner.............................................   15 "

The $5,000 note (No. 2) of Louque to White, given by Buck to Jones, was afterwards taken up by the company, by the payment of $2,500 in cash and $2,500 in stock.

A number of persons afterwards subscribed to the stock of the company and paid for the same, and money was borrowed on the credit of the company and the endorsement of some of the directors, some $45,000 being thus put into the treasury by persons other than Buck, the most of which was entrusted to Buck, as manager, for disbursement.

Suit was afterwards brought against the company by the State of Louisiana to recover possession of the property, and judgment in favor of the state was rendered, from which an appeal was taken to the appellate court, where it still remains unsettled.

The affairs of the company proceeded under the management of Buck until October, 1892, when a meeting of the other stockholders was held, of which Buck claims no proper notice was given, at which another board of directors was elected and Buck retired from the presidency.

He, however, continued as manager until, some further change being contemplated, Buck and his friends, claiming that the election of October, 1892, was irregular and void, issued a call for another meeting of the stockholders, to elect directors, and this bill is filed partly for the purpose of preventing Buck and the other defendants from voting at such meeting upon the stock

which they hold, which is a part of the original twelve thousand shares issued as aforesaid.

I take the law, applicable to this case, to be that " no rights, legal or equitable, arise in favor of a corporation in respect of transactions, whether complete or inchoate, merely because entered into in contemplation of the creation of such corporation," and that it was open to Dr. Buck to buy the property on his own account, for any price he could, with the intention or in the hope of selling it at a higher price to a company to be formed, and, dealing independently, to sell it for such higher price to such company so long as he obtained his higher price fairly. That would be clearly unobjectionable. But if he, at the time of his original agreement with White, entered into it on behalf of the future company, under such circumstances that the company, when formed, could say that the purchase made by him was made for the company, or if, at the time the actual purchase was made from White, Dr. Buck was a trustee, officer or agent of the company, he cannot be permitted to make any profit from the sale to the company. Buck, as the promoter of the corporation, stood in a fiduciary relation to the company as soon as it was organized. As such promoter, it was open to him to sell property which he owned, to the company, on making full and fair disclosure of his interest and position with respect to that property. Not only was such disclosure necessary, but it was incumbent on him, as sole promoter of the company, formed to purchase this specific property, controlling and moulding its organization, to furnish it with an executive or board of directors capable of forming competent and impartial judgment as to the wisdom of the purchase and the price to be paid ; and if he, as such promoter, procured the company to be formed and to be managed in such a way as to transfer from the moneys of the company to himself a certain sum without informing the company of that fact, or, what is the same thing, if he took without such disclosure, to his own use, stock of the company issued for the purchase of property, ostensibly to or for another, he cannot retain the same.

Lord-Chancellor Cairns, in *Erlanger* v. *New Sombrero Phos-*

*phate Co., 3 App. Cas. 1218* (at *p. 1236*), says: "In the whole
of this proceeding up to this time, the syndicate, or the house of
Erlanger, as representing the syndicate, were the promoters
of the company, and it is now necessary that I should state to
your lordships in what position I understand the promoters to
be placed with reference to the company which they proposed
to form.   They stand, in my opinion, undoubtedly in a fiduciary
position.   They have in their hands the creation and moulding
of the company; they have the power of defining how and
when, and in what shape and under what supervision it shall
start into existence and begin to act as a trading corporation.
If they are doing all this in order that the company may, as
soon as it starts into life, become, through its managing direct-
ors, the purchaser of the property of themselves, the promoters,
it is, in my opinion, incumbent upon the promoters to take care
that, in forming the company, they provide it with an executive
—that is to say, a board of directors—who shall both be aware
that the property which they are asked to buy is the property
of the promoters, and who shall be competent and impartial
judges as to whether the purchase ought or ought not to be
made.   I do not say that the owner of property might not pro-
mote and form a joint stock company and then sell his property
to it, but I do say that if he does he is bound to take care that
he sells it to the company through the medium of a board of
directors, who can and do exercise an independent and intelli-
gent judgment on the transaction, and who are not left under
the belief that the property belongs, not to the promoters, but to
some other persons."

Lord-Justice Lindley, in *Lydney & W. Iron Ore Co.* v. *Bird,
33 Ch. Div. 85* (at *p. 93*), says: "In the present case, James Bird
procured the company to be formed and to be managed in such
a way as to transfer from the moneys of the company to him-
self the sum of £10,800 without informing the company of that
fact.   The company were told that they had to pay £100,000
for the property, but they did not know that of that sum,
£10,800 was to go into the pocket of the man who had got the
company up and who has, in fact, increased the purchase-money

in order to get that £10,800.  Under these circumstances, he cannot retain the sum so got.  Although not an agent of the company nor a trustee for it before its formation, the old familiar principles of the law of agency and of trusteeship have been extended, and very properly extended, to meet such cases; and, using the word 'promoter' to describe a person acting as James Bird did, it is perfectly well settled that a promoter of a company is accountable to it for all moneys secretly obtained by him from it, just as if the relationship of principal and agent, or of trustee and *cestui que trust*, had really existed between them and the company when the money was so obtained.  Nor, in such a case, is it necessary for the company to rescind the whole transaction of which the payment by the company of the money in question is found to be part."

Lord-Justice James, in *New Sombrero Phosphate Co.* v. *Erlanger, 5 Ch. Div. 73* (at *p. 118*), says : " Now, I adhere entirely to what I said in the *Govers Case*—that is to say, that it is quite open to a man to buy any property, at any price he likes, with the view or in hope of selling that property to any company that he can get to buy it, if that is the mode in which he intends to dispose of it.  A man may buy at any price, and may sell at any price that he can fairly get for it.  But that has nothing whatever, as it appears to me, to do with this case, which is whether a man who has bought at a low price has obtained a higher price fairly and properly, in accordance with the view which the court of equity takes of such transactions.  Now, in this case it appears to me that the decree follows almost necessarily from two or three propositions.  A promoter is, according to my view of the case, in a fiduciary relation to the company which he promotes or causes to come into existence.  If that promoter has a property which he desires to sell to the company, it is quite open to him to do so, but upon him, as upon any other person in a fiduciary position, it is incumbent to make a full and fair disclosure of his interest and position with respect to that property."

Sir George Jessel, M. R., in *In re British Seamless Paper Box Co., 17 Ch. Div. 467* (at *p. 471*), says : " I quite agree to this,

that if promoters make an arrangement to get a profit for themselves out of what is apparently paid to the vendors, it is immaterial whether the contract with the vendors is approved of by the directors of the company, who are the promoters, just before the allotment or just after; in both cases it is intended to cheat the future shareholders; and of course it makes no difference whatever that the persons who, at the time the allotment was made, were in fact the promoters or their nominees, knew of the fraud.    You can defraud future allottees as well as present allottees."

See, also, *Green Br. U. V.* (*2d ed.*) *596.*  (The clause in the latter part of the proposition " or with the intention that the corporation shall subsequently acquire the subject of the transaction," with reference to which a doubt is expressed on *page 598*, is, I think, rejected by the cases decided since the publication, if not by those mentioned by the author.)    *Govers' Case, L. R. 20 Eq. 114; S. C. on appeal, 1 Ch. 182; Bagnall* v. *Carlton, 6 Ch. Div. 371; Emma Silver Mining Co.* v. *Grant, 11 Ch. Div. 918; In re Cape Breton Co., 26 Ch. Div. 221; S. C. on appeal, 29 Ch. Div. 795; Ladywell Mining Co.* v. *Brooks, 34 Ch. Div. 398; S. C. on appeal, 35 Ch. Div. 400; McElhenney's Appeal, 61 Pa. St. 188; Simons* v. *Vulcan Oil Co., 61 Pa. St. 202; Densmore Oil Co.* v. *Densmore, 64 Pa. St. 43; Hoffman S. C. Co.* v. *Cumberland C. & I. Co., 16 Md. 456; Beck* v. *Kantorowicz, 3 Kay & J. 230; Atwool* v. *Merryweather, 37 L. J. Ch. 35; Hichens* v. *Congreve, 1 Russ. & M. 150; Phosphate Sewage Co.* v. *Hartmont, 5 Ch. Div. 395; Pittsburg Mining Co.* v. *Spooner, 24 Am. & Eng. Corp. Cas. 1 and note; 16 Am. L. Rev. 671; 1 Morawetz Corp.* § *546; Thomp. Corp. Off. 220; Cook Stock.* (*2d ed.*) § *651 and note.*

In July, 1891, when Dr. Buck made his agreement with Mr. White, no company was incorporated to carry out the agreement, and he cannot properly be said to have occupied, at that time, the position of a trustee or agent of the company.    But is the company, from the circumstances attending that agreement and the subsequent acts of Dr. Buck, now in a position to say, " While we were not incorporated at the time, the contract you

made was made for us?" This is the test mentioned by Lord-Justice Cotton, in *Ladywell Mining Co.* v. *Brooks, supra.* There can be no question raised as to Buck's having been the promoter of the company. He issued the prospectus which is subscribed by himself, and he secured the co-operation of the persons who became the incorporators and the first shareholders, and was present and took part in the organization, although he does not appear as one of the incorporators. He dealt with the stock, contemplated to be issued, as one who assumed to have authority to dispose of it. Not only does he agree to pay Jones in shares of the stock of the company to be formed, but in his agreement with White he stipulates that $10,000 of the purchase-money is to be paid in the stock, at par, of the company to be formed for the development of said land. The fact that part of the consideration is to be paid in the stock of a company, cannot be considered as conclusive evidence that the purchase is made for such corporation, for if the original purchaser intended to sell to a company to be formed, as he might lawfully do, and take stock of said company as part payment, he could, of course, agree with his vendor to pay him partly in such stock. *Govers' Case, supra,* is an authority for this. It is true that some of the positions taken in that case were at one time seriously criticised, but, as explained by Lord-Justice James, in the *Erlanger Case, 5 Ch. Div.* (at *p. 118*), it must, I think, be taken as recognized and adopted by the later decisions. While it is true that it is not conclusive on the point, it has nevertheless been, and in my judgment should be, taken as a very important consideration in determining the question as to whether the purchase was made for the company. Lord-Justice Cotton, in the *Ladywell Mining Co. Case, supra,* recognized this, and states, as one of the reasons why the actor in that case should not be held to accountability, that " no part of that purchase-money [of the mine] was to be provided for out of the funds of the company, or to consist of shares of the company." And Mr. Justice Sterling, in the same case, *34 Ch. Div.* (at *p. 407*), says: " It is not immaterial to mention that that agreement [for the purchase of the mine] was carried out and the purchase-money was paid by them out of their own pockets." Vice-

Chancellor Bacon, in *Craig* v. *Phillips, 3 Ch. Div. 722* (at *p. 735*), lays stress on the fact that the defendant, before any prospectus had been issued, on his own responsibility and with his own moneys, purchased the property for £16,000.  So, also, does Vice-Chancellor Malins, in the *Erlanger Case, 5 Ch. Div.* (at p. *94.*)

Dr. Buck, in his negotiations, both with the agent and with White, and afterwards with Mrs. Diffenderfer, seems to have avoided any personal liability except so far as it was necessary for the incorporation of the company and the payment of the small amount of cash to White.  If he had relied on outside parties to organize the corporation, and then had dealt with it as such independent company, his disposal of the stock might have been of little significance.  But he became and was the life and spirit of the corporation.  Every step taken in its formation was either by him or by his procurement.  The prospectus issued by him over his own signature is of a company to be organized, as described in his agreement with White, for the development of said lands.  The two maps forming a part of said prospectus each contain a tract delineated thereon, the first with the explanatory note, as follows: "Inside black lines show proposed purchase of the Plaquemines Tropical Fruit Co.," and the other, "The proposed purchase of the Plaquemines Tropical Fruit Co."  It is true that this prospectus is for a corporation of that name to be organized under the laws of the State of Maryland, but it abundantly appears by the affidavit of Dr. Buck that the complainant corporation is the same company referred to, its organization under the laws of this state instead of under the laws of Maryland having been subsequently determined on.

This prospectus, after a description of the property, a statement of its fertility and the prospect of the financial success of the company, referring to the title to the land, says:

"It is incontestable; it was part of the great Louisiana purchase from France and was deeded to Louisiana by the United States.  Sold and patented by Louisiana to C. C. Packard in 1868, and by his assignees in bankruptcy deeded to the present owner in 1879.  *  *  *  And even as late as November, 1890, the supreme court of this state, in settling a dispute between the

owner of one of the small tracts specified as excepted in the deed and a squatter, affirmed that the only title to the land was vested in the assignee of Patent 526, State of La., *who is the grantor in the sale to this company.*"

The chain of title, as stated in the deed from White to Louque, is as follows :

" Being the same lands which were acquired by the present vendor, Robert M. White, by purchase from E. E. Morton, assignee in bankruptcy of C. C. Packard, on the fourth day of April, 1879.   And the said C. C. Packard acquired the same by letters-patent from the said State of Louisiana by Patent 526, dated the thirtieth day of September, 1869."

The statement of the prospectus, in view of these facts, can only mean that Robert M. White was to be the grantor to the company.

It is true that Dr. Buck says he claimed, at the meeting to organize the company, that he held the option of purchase in his own right, and that he proposed to be the vendor to the company.   He says that he made the offer of sale in writing, and that he called the attention of those present to the fact that he, and not White, was the vendor, when the resolution was first read at the meeting.   This proposal in writing is not produced, although each side called on the other for it, both denying its possession.

The persons at that meeting besides Dr. Buck were Mr. Lynah, Mr. Diffenderfer, Mr. Morrison and Mr. Reynolds. Mr. Lynah says : " I don't think there was anything said about Dr. Buck having an option ; I understood that the property belonged to Robert M. White and that Dr. Buck was authorized to purchase it from Robert M. White for the company, the consideration being $10,000 in cash money and the balance afterwards, $30,000 in money and $120,000 in stock, making $150,000 for the property ;" that he understood that from the statements made by Dr. Buck ; that an issue of $120,000 in stock was ordered, that was to be given to Dr. Buck in blank for the purchase of the property, in addition to the cash payment of $10,000 which was to be made ; that the stock was to be given to Mr. White for the property by Dr. Buck, and that he under-

Plaquemines Tropical Fruit Co. v. Buck.

stood that Dr. Buck was to take the stock to New Orleans and tender it in purchase of that property.

Mr. Diffenderfer does say, at the end of the meeting (not when the resolution was originally read), when the minutes were read, Dr. Buck called attention to the fact that Robert M. White's name was mentioned as the seller of the property instead of himself, saying that it was a mistake, and that he was selling the land, and not White; but neither Mr. Morrison nor Mr. Lynah make any mention of any such occurrence.

The rough minutes of this meeting were kept by Mr. George Reynolds, a member of the bar, and are produced. Mr. Reynolds had no knowledge of this transaction except such as he had gained from what transpired at the meeting. The original resolution, drawn in Mr. Reynolds' own handwriting, reads: "Resolved that the company purchase from Robert M. White 28,000 acres of land more or less" &c.

This could only have been so written by Mr. Reynolds from instructions which he received or from the impressions which he derived at that meeting. It is true that this has been altered by drawing a pencil mark through the name of Robert M. White and writing "Dr. Buck" over it. Mr. Reynolds is under the impression that Dr. Buck's name is not in his handwriting. Mr. Diffenderfer and Dr. Buck are the only persons who seem to have any recollection of the alteration having been made at that time, and the conclusion seems irresistible that Dr. Buck's remark was made so that Mr. Diffenderfer alone heard it. All these facts, in my judgment, give the company the right to say that the purchase, originally made, was made for it.

But if Dr. Buck is not to be considered as having originally purchased this property for the company, does he stand in any better position?

At the first meeting for organization it was decided that the board of directors should consist of seven members, and he was elected one of them. At the meeting of the directors, immediately subsequent, there were present Dr. Buck, Messrs. Lynah, Diffenderfer and Morrison, Dr. Buck being necessary to the quorum of seven. In the regular book of minutes it appears

that the resolution to purchase the property was passed at the meeting of the directors. In Mr. Reynolds' rough notes of the proceedings, however, it appears that this resolution was the last business transacted at the stockholders' meeting following the election of directors. The last clause of the resolution is, " and that the board of directors are hereby ordered to carry this resolution into effect," which would indicate that it was a stockholders' resolution. Dr. Buck, in his affidavit, states that this resolution was passed at both meetings. If we assume that this resolution was only passed at the directors' meeting, as shown by the book of minutes, and that Dr. Buck was the owner of the property, there can be no question but that he stood in a fiduciary relation to the company at the time, and was bound, under all principles of equity, to make full disclosure as to his relations to the property and his interests therein ; and, being necessary to a quorum, the purchase of the property from him by the board of directors, so constituted, would give the company, under the circumstances, the right to rescind the contract.

If the resolution was originally passed at the stockholders' meeting, he, as a promoter of the company, at that time stood in a fiduciary relation to it and was bound to disclose his interests in and relation to the property. I think the weight of evidence is as stated—that he made no such disclosure at the meeting of the stockholders, and only, if at all, at the end of the directors' meeting, and then only in the hearing of Mr. Diffenderfer.

The resolution of the stockholders can only be considered as advisory and as giving their consent. The function of this meeting of incorporating shareholders was for organization in the first place, the adoption of by-laws and the election of directors afterwards. It may sometimes become necessary in the transaction of some kind of business of a corporation, to have the consent of all the stockholders, or of a certain proportion of them, and resolutions giving such consent or advice have the effect of empowering the directors to act. But the board of directors is the legal executive, recognized as such not only in practice and on principle, but by the statute. The sixteenth section of the Corporation act provides that the business of every such com-

pany shall be managed and conducted by the directors thereof. I regard the passage of this resolution by the stockholders as simply advisory, and that the corporate act which, in law, made the company a party to the purchase was the resolution of the directors, of which Dr. Buck was a member and present and necessary to the quorum at the time it was passed.

But whether this is so or not, when Dr. Buck reached New Orleans, having in his possession the stock of the company to make a payment to Mr. White, the latter gentleman refused to carry out the agreement, and Dr. Buck thereupon instituted, in the United States circuit court, an action for the specific performance thereof. While this suit was pending, an understanding was arrived at by the parties, by which Mr. White agreed to convey the lands under certain conditions. Dr. Buck calls the changes modifications of the original agreement, and probably that is a proper characterization. He says in his affidavit that by this arrangement Mr. White was to convey four thousand acres more of land than contemplated originally. White was to receive $27,000 in place of $25,000, and he was to have the right to cut willows on the tract and to clear all the land for agricultural purposes for one year. He was to pay eleven-twelfths of its tax for the current year, and Buck was to pay the costs of the suit. While, as between White and Buck, this might properly be called a modification of the original agreement, it is nevertheless, so far as the company was concerned, a new contract. There is no evidence to show what value is to be attached to the right to cut willows upon this tract of thirty-two thousand acres for one year, but it does appear that such wood is useful there for jetty work, nor what the right to clear all the land was worth, but these rights were in fact a burden upon the land and were incorporated in the deed.

The company, up to the time of that subsequent contract, had not become a party to any such agreement. It had not agreed to purchase that amount of land or to encumber its purchase with such conditions or privileges. It only did so become a party thereto on the theory that Dr. Buck entered into the contract as agent of the company. This, of course, would give the

company a right to adopt it or not, but it puts Dr. Buck, at this time, in making this contract, in the position of acting, not on his own behalf, but as agent and trustee of the company; and if so, under all the authorities, he cannot be permitted to make any profit out of it.

Again, in organizing the company Dr. Buck selected as incorporators and first officers his brother-in-law, Mr. Morrison, to whom he promised a bonus of one hundred shares; Mr. Clotworthy, to whom he promised a bonus of five hundred shares; Mr. Mason, to whom he promised a bonus of one hundred and fifty shares; Mr. Diffenderfer, the husband of the lady to whom Dr. Buck promised five hundred shares because she had introduced him to Mr. Jones; Mr. Lynah, who says he became interested from the fact that he had sold Dr. Buck some houses, for which he took $1,000 in stock of the company and the balance in cash and a note—he appears as a subscriber for the one hundred shares of stock in their original certificate of incorporation—and says that he got his stock in January, 1892, from Dr. Buck. Of these gentlemen elected directors, only Mr. Lynah, Mr. Morrison and Mr. Diffenderfer were present at the meeting either of the incorporators or of the directors at which this purchase was resolved. A moment's consideration shows that all these parties were pecuniarily interested in Dr. Buck's carrying out his scheme, and that they could not be considered as competent and impartial judges of the wisdom of making the purchase, nor of the value of the land to be conveyed nor of the price to be paid therefor. It would be difficult, in my judgment, to imagine a case more clearly within the lines of the case of *New Sombrero Phosphate Co.* v. *Erlanger, 3 App. Cas. 1218.*

It is unnecessary to consider the extent of the relief to which the complainant corporation is entitled. But there can be no doubt as to the duty of the court to retain, until final hearing, the injunction to prevent the defendants from disposing of their stock and voting upon it at the meeting of the board of directors, and I will advise that the rule to show cause be made absolute and that an injunction issue to the end suggested.