The bill of complaint is filed under the New Jersey Securities act. Rayon Industries Corporation is a Delaware corporation organized May 20th, 1933, with a capitalization of one million shares of class A stock, par value $1, and five hundred thousand shares of class B stock, par value $1.
At the first meeting of the board of directors on May 29th, 1933, Simon Levin, one of its members, and the president of the corporation, made an offer, dated May 24th, 1933, which was accepted to sell the corporation forty-eight and a half per cent. of the stock of Norfolk Weavers, Incorporated, a Virginia corporation, together with all of the stock of College Weavers, Incorporated, and College Throwsters, Incorporated (Massachusetts corporations), Beldray Industries Corporation and Beldray Thowsters, Incorporated (Michigan corporations), and S. Levin 
Company, a New York corporation. By the terms of the offer Simon Levin was to receive five hundred thousand (500,000) shares each of the class A and B stock, $150,000 in cash, and a three years' employment contract *Page 94 
as general manager at $25,000 per year, with an option of renewal for two years. Later a change was made whereby Levin gave back the five hundred thousand shares of class A stock and in lieu of the $150,000 in cash agreed to be paid to him, accepted seventy-five thousand shares of class a treasury stock.
In 1931, while industry generally was in the throes of a business depression, an idle plant at Norfolk, Virginia, was brought to the attention of Levin and he negotiated for the purchase of the plant, formed Norfolk Weavers, Incorporated, and interested local capital in the enterprise. Shortly the plant, under his management, employed upwards of three hundred employes and was operating day and night. Between the time of the organization of the plant and its subsequent sale to the Rayon Industries Corporation, the Norfolk Weavers, Incorporated, paid in dividends to the Norfolk interests upwards of $100,000, or at the rate of four hundred per cent. on an investment of $25,000. He next acquired a plant (College Weavers, Incorporated) in the early part of 1931, located at Northampton, Massachusetts. Later, in connection with the operation of the Northampton plant, he leased a throwing plant at Haydenville, Massachusetts, and another at Florence, Massachusetts (both of which last two plants are being leased by College Throwsters, Incorporated). College Weavers, Incorporated, was organized March 11th, 1932, and College Throwsters, Incorporated, in August, 1932, both in Massachusetts. Both plants soon operated at full capacity day and night, the one employing approximately five hundred and fifty people, and the other about eighty people. S. Levin Company, while not incorporated until June, 1933, had been an operating organization for years, buying and selling profitably on a commission and had between seventy-five and one hundred contracts for the production and sale of rayon. Levin testified the demand was so great that he could not meet it.
Also at the first meeting of the board of directors, the defendants Vance and his corporation, the First Continental Corporation, offered to sell to the Rayon Industries Corporation, *Page 95 
Belding-Hemingway mills numbers 1, 2 and 3, at Belding, Michigan, and Haydenville mill number 13, at Haydenville, Massachusetts, and the Norfolk real estate; the first plant subject to a lease held by Simon Levin, dated January 18th, 1933; the second subject to a lease held by Levin dated January 18th, 1932; and the third subject to a lease held by College Throwsters, Incorporated. In addition to the real estate and machinery, the offer included the remaining fifty-one and a half per cent. of the stock of Norfolk Weavers, Incorporated. The real estate was subject to mortgages aggregating $155,000. In exchange for the real estate and stock, the offer contemplated the issuance to the First Continental Corporation of five hundred thousand shares of Rayon Industries Corporation class A stock, par value $1 a share, and it was accepted. The actual cash investment of the First Continental Corporation in the properties and stock was $83,750. The properties thus conveyed were appraised at depreciated values at $676,180. This valuation does not take into consideration the value of the fifty-one and a half per cent. of the stock of Norfolk Weavers, Incorporated, which represented control of that company, and upon which as hereinbefore stated there had been paid in dividends over a short period of time upwards of $100,000, or a return of four hundred per cent. on an original investment of $25,000.
Complainant contends that Levin's investment in the properties of the various corporations whose stock was the subject-matter of the sale to the Rayon Industries Corporation, was not more than $131,000, and that the difference between that amount and the $575,000 of the par value of the stock of Rayon Industries Corporation which he received constitutes a secret undisclosed profit obtained by a promoter at the expense of the corporation, and charges that the other members of the board of directors, Donovan, Hecht and Wilson, were merely "dummies." The uncontradicted proof, however, by Levin and two of the other directors is that Levin made full and complete disclosure of all of the facts and details of the transaction, and the charge is not sustained. The properties transferred by Levin to the corporation were *Page 96 
appraised by Ford, Bacon and Davis, appraisal engineers of high repute, at a reproduction cost of $2,194,720, as of the date of the sale, and after depreciation at $1,562,430. Under our decisions a promoter may purchase property on his own account for any price he can, with the intention of selling it at a higher price to a company formed or to be formed and sell to that company at a profit, so long as he does so fairly. (Italics mine.) Plaquemines Tropical Fruit Co. v. Buck, 52 N.J. Eq. 219.
Under such circumstances no rule of law or equity prohibits such profits. Bigelow v. Old Dominion Copper Mining andSmelting Co., 74 N.J. Eq. 457; Allenhurst Park Estates, Inc., v.Smith, 101 N.J. Eq. 581. In 1 Thompson on Corporations (3ded.) § 123 (at p. 152), the author says, "and where promoters formed a syndicate for acquiring and working a gold mine for their own profit; and sometime thereafter, for the purpose of acquiring additional capital, they organized a corporation and sold their mine to it, it was held that they were not placed in any fiduciary relation at the time of the original agreement to the corporation which they subsequently promoted. Where no fiduciary relation exists the mere suppression by a promoter of the amount of profit being made by him on a sale does not amount to a fraud. Where a person purchased and paid for land, and thereafter organized a corporation, to which he offered to sell such land, it was held that he did not thereby stand in any fiduciary relation to the subscribers to the capital stock." English and American cases are cited in support of the statement.
Levin had been actively engaged in the manufacture of rayon and kindred lines long before the acquisition of some of the properties in question. For nineteen years past he was variously engaged either as salesman, broker or importer of textiles, and finally owner and operator of textile plants. In a true promoter's case where there is an allegation of a secret profit and where the property was purchased with the intent of forming a corporation and turning the property over to it, it has been held that such profit could not be retained unless the same was disclosed either to an independent board of *Page 97 
directors or to the stockholders, or unless the promoters themselves take all of the stock. In such case responsibility is not based upon fraud, but upon the rule of fiduciary relationship. 1 Thompson on Corporations (3d ed.) 149 §120. If the property turned over is of the value that the corporation paid for it, there may still be responsibility, but there is no fraud.
The complainant charges that the directors of the Rayon Industries Corporation were "dummies." The proof is that one of them is a graduate of Lowell Textile School of Massachusetts; was connected for four and a half years with a prominent commission house engaged in the textile and cotton business; identified for seven and one-half years with the largest manufacture of textiles, in charge of their rayon division, and connected with S. Levin Company for the past four years; another director was engaged in the textile industry in various capacities for about eighteen years and associated with S. Levin Company for about three years; and the third director was for a number of years one of the members of the board of directors of the largest silk manufacturing concern in the world, and afterwards became superintendent of a silk plant in Norfolk, and was instrumental in organizing Norfolk Weavers, Incorporated, and represents the Norfolk group on the board of directors of the Rayon Industries Corporation who at this time have an interest in the class B stock. The directors, other than Levin, own no stock in the corporation, and indeed are not required to be stockholders under the law of the State of Delaware. The proof, it seems to me, refutes the charge that these men were "dummies," and under the thumb of Levin.
At the same directors' meeting the First Continental Corporation agreed to underwrite four hundred and twenty-five thousand shares of the class A treasury stock, par value $1, at $2 a share. The agreement for the purchase of the real estate and stock of the Norfolk Weavers, Incorporated, from the First Continental Corporation provided that two hundred thousand of the five hundred thousand shares of the class A treasury stock of Rayon Industries Corporation should be *Page 98 
issued to First Continental Corporation on delivery of the fifty-one and one-half per cent. of the stock of Norfolk Weavers, Incorporated; the deed covering the real estate at Norfolk and the balance of the stock to be issued upon delivery of title to the Belding and Haydenville properties. The deed to the Norfolk property was not delivered until June 27th, 1933. Before that date, it is claimed that one hundred and eighteen thousand six hundred and ninety-six shares of the treasury stock were issued to First Continental Corporation on the order of the Rayon Industries Corporation. The complainant insists that this was a violation of the agreement, and that it was necessary in order to enable the First Continental Corporation to raise the moneys to enable it to take the title to the real estate which it then was under contract to purchase. The First Continental-Rayon contract provided that title was to be delivered not later than September 18th, 1933, but it also contained a provision that the purchaser had the right to require performance sooner than September, 1933, as follows: "The seller agrees that the date of closing may be advanced by the purchaser to any time prior to September 15th, 1933." The proof is that the Rayon Industries Corporation elected to take advantage of this clause of the contract because of its desire to secure the title to the real estate as soon as possible, but that upon investigation, its attorneys found that the title was subject to certain minor legal objections. Conferences were had between the president of the Rayon Industries Corporation and Vance, the president of the First Continental Corporation, and their attorneys, with respect to the situation, the Rayon corporation being desirous of securing the title to the real estate before converting the machinery and equipment in the buildings. Levin and Vance both testify that Vance offered to advance the moneys necessary to close the transactions, and deny that any of the stock of the Rayon Industries Corporation was issued to the First Continental Corporation in order that it be sold to the public and the money acquired used in the acquisition of these properties. The transactions were completed, the real estate was conveyed, and the stock of the Norfolk Weavers was transferred, *Page 99 
as contemplated by the agreement. The First Continental Corporation also agreed to purchase the seventy-five thousand shares of class A treasury stock issued to Simon Levin at $2 a share.
The consolidated balance sheet of Rayon Industries Corporation and subsidiaries as of May 31st, 1933 (Exhibit D-5), shows land, buildings, machinery and equipment, c., appraised by Ford, Bacon and Davis, Incorporated, at reproduction cost $2,304,620, less depreciation to May 1st, 1933, $742,190 — $1,562,430. Upon the final hearing according to the evidence the company had cash on deposit with banks as of August 1st, 1933, $714,327.53.
The defendant Marshall Ward Company agreed to take over the stock of the Rayon Industries Corporation from the First Continental Corporation at $2.25 a share. This included the original issue of five hundred thousand shares of class A stock acquired by the First Continental Corporation from Rayon Industries Corporation in exchange for the property and stocks heretofore referred to; also the four hundred and twenty-five thousand shares of class A treasury stock and the seventy-five thousand shares of class A treasury stock purchased from Simon Levin.
Marshall Ward Company agreed to sell the stock to Patton 
Company at $3 a share, the difference of seventy-five cents a share, after the payment of all expenses of advertising and marketing the stock, to be divided equally between the two, and Marshall Ward Company caused a public offering of the stock to be made at $3 per share on June 23d 1933. Advertisements of the offering were published in approximately thirty newspapers throughout the country. The entire offering of five hundred thousand shares was sold to dealers, individuals, and to Patton 
Company, and to a syndicate group. Of the second five hundred thousand shares, Marshall Ward Company purchased and paid for approximately four hundred and twenty-five thousand shares. On July 15th, 1933, Marshall Ward Company and the First Continental Corporation entered into an agreement which was filed with the New York Produce Exchange, whereby it *Page 100 
was provided that when the closing price on the securities market of the New York Produce Exchange for shares of class A stock of the Rayon Industries Corporation exceeded $5 a share, Marshall Ward Company, in taking down shares of the treasury stock of the corporation, would be obliged to pay not merely $2.25 per share to the First Continental Corporation, but in addition, fifty per cent. of the excess over $5 to the treasury of Rayon Industries Corporation, and Marshall Ward Company assert that it is the largest individual stockholder of Rayon Industries Corporation.
Through the defendant Patton Company reservation of a quantity of the stock was made for Clement H. Congdon, the owner and publisher of a financial journal called the "National Investment Transcript," a weekly publication published at Camden, New Jersey, by the National Investment Transcript, Incorporated. While the stock of the Rayon Industries Corporation was not offered for sale through the publication, a suggestion appeared therein that the editor, Clement H. Congdon, would shortly recommend a low-priced industrial stock to those subscribers inquiring for the name of the stock. Subsequently Congdon advised the purchase of Rayon Industries Corporation stock, and issued a brochure entitled "New Trends and Profits in the Rayon Industry as Exemplified by the Growth and Prospects of Rayon Industries Corporation." A letter by Congdon dated July 1st, 1933, mailed about July 15th, 1933, accompanied the brochure. In the letter he said that his interest "is not merely a passing interest, but dates back to 1888 when I contracted to publicise Ramie, the original fibre product." Further, he wrote that in order to comply with the new securities laws of the nation "and also my desire to present the interest of myself as it complies with the new securities laws of the nation" in Rayon Industries Corporation "that through the usual brokerage channels a reservation has been made on behalf of myself and my subscribers at $3 a share and I expect to make a profit if and when sold." He assures the reader that all he knows about the finances, property, c., of Rayon Industries Corporation *Page 101 
is fairly and fully set forth in the brochure; that his representations in previous communications were fairly conservative, and requests communication by wire on receipt of the letter. He predicts "a very active and higher over-the-counter market" and adds that quotations show tremendous interest in all affiliated issues with the rayon industry. "It is now my sincere belief," says he, "that the sequence of events carrying all such issues up from extreme `low's' to sensational `high's' will be repeated relatively in the future of Rayon Industries Corporation." * * * "The public offering has been made and from my understanding was met with popular demand inasmuch as the issue was oversubscribed with the result that the books are now closed to any further reservation at the $3 price." Other statements in the brochure are:
"More than two thousand skilled employes will soon be weaving rayon fabrics under contracts involving no element of risk or credit — and at a substantial profit as proven by the results achieved by the plants controlled in 1931 and 1932."
"Rayon Industries Corporation has been one of the pioneers in the rayon and weaving division of the great textile industry. It is the unit that has made the most progress. Beginning with one mill, in 1931, the organization now operates six plants."
"Rayon Industries Corporation, having led the way since 1931 in its profitable subsidiaries, may be and should be expected to retain its pre-eminence."
While the facts hereinbefore quoted are true as to the constituent companies which made up the Rayon Industries Corporation, that company itself was not organized until May, 1933. Therefore the statement that Rayon Industries Corporation "led the way" in 1931 is not true. Similarly with respect to statements concerning the number of subsidiaries and plants in operation and past earnings record.
Section 6 of the act provides that if "it shall appear to the court that any such person, * * * corporation, * * * has engaged in, or is engaging in, * * * any practice *Page 102 
declared to be illegal and prohibited by this act, the courtmay issue an injunction restraining such person, * * * corporation, * * * from continuing such practices or engaging therein or doing any acts in furtherance thereof, and the courtmay also issue an injunction restraining the issuance, sale, offer for sale, * * * within or from this state of any securities by such person, * * * corporation, * * * until the court shall otherwise order." (Italics mine.)
Regardless of Congdon's honesty of purpose, the inaccuracies to which I have referred constrain me to find that he and the National Investment Transcript, Incorporated, must be enjoined from selling or offering for sale, or recommending, either through the columns of the National Investment Transcript or otherwise, Rayon Industries Corporation stock by or through the use of said brochure, or by or through the use of any of the statements contained in such brochure and found herein to be untrue, or by any misrepresentation by word, conduct or in any manner of any material fact, either present or past, in relation to Rayon Industries Corporation and the stock of said corporation.
As to the other defendants the bill of complaint is dismissed.