# WOODBURY HEIGHTS LAND COMPANY

## *v.*

## HENRY C. LOUDENSLAGER.

1. One who engages with the owner of a tract of land in organizing a cor-
poration to purchase the land, by procuring subscribers, frames the prospectus,
and becomes one of the first subscribers, is a promoter of the corporation.

2. Defendant joined with the owner of a tract of land in procuring options
of doubtful validity on adjoining tracts, and then organized a corporation, of
which he became president, to purchase the land at an advanced price, under
an agreement with his co-promoter alone that he was to receive part of the
profits thus to be realized. He then procured deeds to himself of all the land

for an actual consideration of $66,223, recited in the deeds as $80,000, and conveyed to the corporation for $80,000 and four hundred shares of stock. He distributed the stock *pro rata* among the stockholders and kept the profits. No part of the money paid the vendors of the land belonged to defendant or his co-promoter, but all was furnished by the corporation.—*Held*, that the corporation was entitled to recover the profits so withheld.

The bill is filed by a corporation against one of its former officers, for an account and recovery of profits realized by him, as is alleged, in the purchase of certain lands for the company while he was president.

The bill alleges that in the year 1889 the defendant procured options of purchase of several tracts of land lying together in Gloucester county and making a compact body, with the view and for the purpose of forming and incorporating a land company to purchase the same at a price much above the option price and making a large profit from the transaction. That, in furtherance of that scheme, he prepared and procured subscribers to a prospectus as follows :

"Prospectus for the forming of a Syndicate to purchase a tract of land along the line of the West Jersey Railroad between Woodbury and Wenonah, Gloucester County, New Jersey, for the purpose of improving the same and laying out in building lots and offering the same for sale.

"This tract of land comprises about four hundred acres at the price of two hundred dollars per acre. The West Jersey Railroad Company runs through the centre of the tract and the officials have consented to build a station for the benefit of the Company. The main water main of the Woodbury Water Works runs through the tract, which can easily be used for the benefit of the purchasers of lots. The tract is high land and commands a fine view of the surrounding country and is one of the finest locations for a town within fifteen miles of the City of Philadelphia.

"The capital required is about eighty thousand dollars, about one-half of this amount to be raised in cash by stock subscriptions and the balance to be raised by mortgage.

"We the subscribers agree to pay the sums set opposite our names as subscribed by us, upon the organization of the Company."

That defendant himself subscribed to the same for $2,500, but concealed at all times from his co-subscribers the fact that he expected to make a profit in the transaction ; that having

procured about $40,000 to be subscribed by about forty different subscribers, he, on the 17th of March, 1890, procured the organization of the company (the complainant herein), himself being one of the corporators named in the certificate of incorporation, and upon its organization became one of its directors and president of the board; that afterwards the said sums so subscribed were paid into the treasury of the corporation by the subscribers; that the defendant procured to be conveyed to himself individually six several parcels of land by six several owners—namely, by Joseph B. Roe, April 14th, 1890, two tracts, containing together about one hundred and fourteen acres; by the executors of Susan Roe, deceased, April 15th, fourteen acres; by John H. Dilks, seventy-one acres; by Ann Reeves and others, twenty-one acres; by West Jessup, one hundred and fourteen acres, and by Caleb C. Pancoast, eighty acres, all on the 16th of April; and on the same day conveyed the several tracts of land, or so much of them as amounted to four hundred acres, to the complainant for $80,000—that is, $38,900 in cash, subject to mortgages for $41,100, and the further consideration of $40,000 in shares of stock of the corporation, which sum of cash and shares of stock were paid and delivered to the defendant in entire ignorance on the part of the stockholders of the said company that defendant was making any profit in the transaction, when, in fact, the sum so paid in cash was much in excess of the amount actually paid by defendant to the several owners of said several tracts of land; that such excess was as much as $20,000, but just how much was unknown to the complainant. That defendant in the purchase of said lands acted as the agent of complainant, and was, in fact, its president, and had no right to derive any profit therefrom; and the bill prays discovery of the amount so received by defendant in excess of the amount paid by him to the vendors of the land, and a decree for its payment.

Defendant, by his answer, denies the concoction of the plan to procure options and form a company, and sell to the company, but alleges that such plan, if it existed, was formed and carried out by Joseph B. Roe, one of the grantors of one of the tracts of land, who himself procured the options mentioned in the bill

Woodbury Heights Land Co. v. Loudenslager.

on his own account for the purpose of making sale of his own farm to a company to be formed, and himself framed a prospectus to sell the same to a company at $250 an acre, which project proving unsuccessful, the project set out in the bill was set on foot, but that it was not a part of the plan that the title of the land should be made to the defendant, and that the several titles were subsequently made to the defendant instead of to the said Roe, because a specialty creditor of the said Roe threatened to enter judgment against him, the result of which would have been to excite action by other creditors of the said Roe and embarrass the carrying out of the project, and that in that affair he acted as the agent for said Roe.  He denies that he prepared the prospectus, or that he procured subscriptions thereto, except in a few instances; he denies that he concealed his interest in the affair from any of the subscribers, and alleges that it was generally known and understood among the subscribers that Dr. Roe was the holder of the options, and was to convey to the company at $200 per acre, which was an advance over the option price.  He denies that he procured the organization of the company, except that he joined with the other corporators in the certificate of its incorporation.  He admits the payment of the subscription and his election as president, which he says was unsought by him and against his will; that the amount paid to him in cash was only about $30,000, the balance of about $9,000 being paid by the complainant directly to one of Roe's creditors; that the $30,000 paid to the defendant was used in paying the several vendors, other than Dr. Roe, and the debts of Roe, and the balance was paid to Roe, except that Roe allowed defendant one-half the profits made by him upon the options from the other vendors; that this allowance was in pursuance of an agreement made between Roe and himself when Roe first undertook to make a market for his land; that he divided the four hundred shares of stock issued to him in part payment of the conveyance among all the subscribers ratably, so that each received two shares of $100 each for each $100 paid by him.

6

*Mr. David J. Pancoast* and *Mr. Howard M. Cooper*, for the complainant.

*Messrs. S. H. Grey & M. P. Grey*, for the defendant.

PITNEY, V. C.

There is little or no dispute as to the facts of the case.

In 1889 Dr. Joseph B. Roe was the owner of a farm of about two hundred and thirty-five acres, lying about two miles southerly from Woodbury, Gloucester county, and on or near the line of the railway. It was heavily mortgaged, and the doctor was otherwise financially embarrassed. In this condition he devised a scheme whereby he might make an advantageous sale of a portion of his farm, in connection with some of his neighbors' adjoining farms, to some institution which needed such a tract, or to a land company which would develop and prepare it for market at retail for villa sites. With that view he approached his neighboring owners, Messrs. West Jessup, Caleb C. Pancoast and John H. Dilks, who controlled about two hundred and sixty acres of land, and procured from each of them written options to purchase their farms at certain prices, averaging considerably less than $200 per acre. The form and precise character of these option papers is not shown. None of them are produced, though complainant seems to have used every reasonable means to obtain and procure them. It is fairly to be inferred that the options were at first merely verbal, and it is clear enough that nothing was at any time paid for them, and no obligation imposed upon Dr. Roe to purchase. They were one-sided contracts—options pure and simple.

In this situation, and, as I infer, before all the options were actually secured, Dr. Roe employed a Mr. Long to try to get subscriptions to a stock company to take these lands at $250 per acre. This attempt failed. He then applied to the defendant, who was then clerk of the county of Gloucester, and had recently launched, with apparent success, a land company in the neighborhood, acting as its president and manager. Defendant arranged with Dr. Roe to assist him in securing the land

options and promoting and organizing a land company to pur-
chase the lands, upon the terms of having one-half the profits
that should be realized from the sale of the lands held under
option at a price greater than that paid to the owner. In pur-
suance of this arrangement defendant wrote out the several
options, and assisted Dr. Roe in making the bargain in one or
two instances. The defendant then drafted the paper called the
"Prospectus," which was engrossed in duplicate and circulated
for subscriptions of stock. He was himself one of the first
group to subscribe, and did subscribe $2,500 to the stock. He
also personally solicited and obtained subscriptions in a few in-
stances, and generally, in casual conversation, as opportunity
offered, recommended the enterprise. When $40,000 had been
subscribed, he, on March 15th, 1890, joined with six other sub-
scribers, viz., Dr. Joseph B. Roe, Isaac Moffett, John Cooper,
David J. Pancoast, J. Alfred. Bodine and William N. Moland,
in organizing the corporation, and at a meeting of the sub-
scribers, on the same day, he acted as chairman, and was elected
one of the directors, with the other six named, and on March
20th, at a meeting of the board of directors, was elected its
president. Calls were then issued for payments on the sub-
scriptions and were apparently responded to promptly, the sub-
scribers being of undoubted pecuniary responsibility.

At the first meeting of directors, March 20th, after the officers
were elected and a call for payment of stock subscriptions was
directed, the following resolution was adopted:

"The vice-president and secretary were authorized to enter into an agree-
ment, in the name of the company, with Henry C. Loudenslager, for the
purchase of the proposed tract of about four hundred acres, at the price of
two hundred dollars per acre, to be paid as follows: The land to be purchased
subject to mortgage debts of forty thousand dollars or more, and the balance
in cash. The president and manager were authorized to proceed with the
purchase and security of title to the land, and engage an engineer and such
other help as may be needed, and proceed with the survey of the land and
laying out the same, or a portion of it, for market as building lots."

In the record of this resolution in the book of minutes the
word "vice" is interlined before the word "president," and the

words "Henry C. Loudenslager" are written over an erasure. No explanation was made of these alterations. The stated secretary was George E. Pierson, but he does not appear to have been present at the meeting in question, as the minute is signed "Joseph B. Roe, Secretary *pro tem.*" The first pages of the minute-book, including that in question, were evidently written up all at one time, and immediately after the certificate of incorporation and the by-laws, so that it is very plain that the minute of March 20th was written in the book by Mr. Pierson from a loose slip, which was probably in the handwriting of Dr. Roe.

At that date, March 20th, defendant did not hold the title to any land contemplated to be sold. In pursuance of this resolution a formal contract in writing was prepared and entered into between the complainant corporation, by its vice-president, and the defendant, dated April 10th, 1890, whereby, in consideration of $200 per acre, and $40,000 in shares of stock of the company, defendant agreed to convey to complainant a tract of land containing three hundred and ninety-nine acres and ninety-nine one-hundredths of an acre, described by metes and bounds contained in fourteen courses, evidently the result of a new and independent survey. At this date he held title to no part of the land.

On April 14th, 1890, Dr. Roe conveyed to the defendant about one hundred and fourteen acres of land for the expressed consideration of $23,000, and defendant executed a declaration of trust as follows:

"DECLARATION OF TRUST MADE BY HENRY C. LOUDENSLAGER.

"To all to whom it may concern—Whereas Joseph B. Roe and wife have this fourteenth day of April, A. D. 1890, conveyed to me two certain tracts of land in Deptford township, Gloucester county, New Jersey, for the consideration named in *said* of twenty-three thousand dollars:

"Now know ye, that I, Henry C. Loudenslager, declare that I hold title to said land for the benefit of the Woodbury Heights Land Company, a corporation of the State of New Jersey, and the consideration named in said deed is to be paid as follows by the said company: The amount of the mortgages now held by the trustees and executors of the estate of R. K. Matlock, as part of said land, for the principal sum of forty-five hundred dollars, are to remain

a lien on said lands, the interest on the same to be paid in cash by the said company. The company to pay to James M. and David Roe, Exrs., the sum of nine thousand dollars on account of a certain mortgage and judgments they hold against said land and said Joseph B. Roe, less any amount that may be due from said James M. and David Roe, Exrs., on account of any taxes paid by said Joseph B. Roe for their account, and when said sum is paid they, the said James M. and David Roe, executors, are to release said land from the operation of said mortgage and judgments. The said company is also to pay the amount of certain executions now in the hands of Frank B. Ridgway, sheriff, issued on judgments against said Joseph B. Roe in favor of John Clement and Daniel J. Packer. And to pay the amount of tax recorded against the same and any other liens that may be against said land and real estate, and to pay to me, the said Henry C. Loudenslager, the sum of two thousand dollars, the amount due me from the said Joseph B. Roe, and also to deduct from the said consideration money the amount of the subscription to the capital stock of the said company by said Joseph B. Roe, being the sum of twenty-five hundred dollars, and then the said company to pay any balance that may remain of the said sum of twenty-three thousand dollars to the said Joseph B. Roe, his heirs and assigns.

" Witness my hand and seal this 14th day of April, A. D. 1890."

The immediate occasion of this conveyance was, apparently, as was stated in the answer, that a creditor by bond and warrant of Dr. Roe was pressing him, and defendant on receiving this conveyance gave his personal undertaking by due-bill to pay that creditor.

Immediately following this conveyance were the following conveyances : .

April 15th, the executors of Susan Roe to the defendant, consideration $1, conveying fourteen acres and thirteen one-hundredths. This parcel was substantially controlled by Dr. Roe, and it appears that the executors of Susan Roe were afterwards paid $842.80.

On April 16th John H. Dilks conveyed to the defendant sixty-five acres and thirty-four one-hundredths, at an expressed consideration of $13,000. The actual amount afterwards paid to Dilks was $8,000, viz., $3,000 in cash over and above a mortgage for $5,000.

On the same day West Jessup conveyed to defendant one hundred and twenty acres, less six acres conveyed to the railway company, leaving one hundred and fourteen acres, at an ex-

pressed consideration of $23,284, but the amount actually after-wards paid to Jessup was $17,463.

On the same day Caleb C. Pancoast conveyed to the defendant seventy-eight acres of land at an expressed consideration of $15,600, but the actual amount afterwards paid him was $12,200.

On the same day the heirs of one Reeve conveyed to the defendant twenty acres and twenty-nine one-hundredths, at an expressed and actual price of $4,717, or about $250 per acre.

The result of all these conveyances was that there were conveyed to defendant about four hundred and thirteen acres of land by six several deeds, at an expressed consideration in each of about $200 per acre, amounting in the aggregate to $79,317, to which if we add the amount actually paid to the executors of Susan Roe—$842.80—we have a little over $80,000, while the actual cost was $66,223.

The difference between these sums, $13,936.80, and the cost of thirteen acres not conveyed, $1,586—in all, $15,522.80—is the sum claimed by the complainant.

Of these four hundred and thirteen acres four hundred were conveyed by defendant to the complainant for $80,000 cash, including mortgages left upon the property, and $40,000 in four hundred shares of stock of the company. These shares were issued to the defendant, but were by him distributed among the several subscribers to the stock in the proportion of their subscriptions, so that each subscriber received in the end two shares of stock for each $100 paid in cash.

The $80,000 of consideration was paid by complainant to defendant as follows:

| | | |
|---|---:|---:|
| Mortgages left upon the property | | $41,100 |
| April 17th, cash | $21,500 | |
| May 26th, cash | 5,000 | |
| June 4th, cash | 3,400 | |
| Total cash | $29,900 | |
| Judgment in favor of Roe's executors against Joseph B. Roe, paid by the company to the executors | 9,000 | |
| Total | | 38,900 |
| Added to the $41,100, makes | | $80,000 |

Defendant claims to have paid nearly all of the sum of $29,900 so received by him to Dr. Roe in cash, either directly or upon his order, but as he claims, and Dr. Roe admits, that he, defendant, was entitled to one-half the profit of about $15,000 made on the transaction, it is difficult to believe, and in fact it was not insisted, that he has not in some way retained control of his share of that sum.

At the time of the transaction none of the directors, except defendant and Dr. Roe, had any knowledge or notice that this profit was made, and so far as appears none of the stockholders, except the same gentlemen and West Jessup and C. C. Pancoast, two of the grantors to defendant, had any knowledge of it.

No money was paid by the defendant or Dr. Roe, or either of them, to the vendors at the delivery of their several deeds. The consideration actually paid went from the corporation through the hands of defendant to the several vendors or their creditors.

From the foregoing facts, and the proper inferences to be drawn therefrom, the true relations of the parties are to be deduced.

*First.* I think that at the date of the organization of the corporation, March 20th, 1890, and the formal contract to purchase, April 10th, 1890, neither Dr. Roe nor defendant was in any true sense the owner of any of the land held under options. They had neither paid nor given anything of value for it, nor had they come under personal obligation with regard to it; nor did they intend to exercise their options until they had secured a purchaser. Indeed, it does not affirmatively appear that the option papers which they held were such as could be enforced either at law or in equity against the vendors. Two of them, Pancoast and Jessup, seem to have been so far interested in the completion of the sale as to subscribe for stock liberally, and to execute deeds expressing a consideration largely in excess of the amount actually paid to them, and to deliver them without consideration presently paid, so that the inference of the validity of these options arising from the actual carrying out of the sale is not very strong.

These circumstances seem to me to prevent the application here of the equitable notion that in cases of executory contracts for the purchase and sale of land the title is, in equity, to be treated as being in the vendee, and the purchase-price as a debt due the vendor. I think that doctrine is not properly applicable to the case of an uncertain, and, at best, bare option to purchase, like those here in question.

This characteristic, namely, that neither Roe nor the defendant was the owner of these lands at the date of this transaction, distinguishes this case from a line of authorities which hold that a party, being already the actual or potential owner of property, either by having the legal title vested in him or by holding it under contract with part of the consideration paid and mutual obligations to pay the balance of the consideration and to convey the property, may innocently promote and organize a company to buy it at an advance.

*Second.* Both defendant and Dr. Roe were active in procuring subscribers to the stock and in organizing the company. Defendant was present when the first batch of large subscriptions was made, and himself subscribed among them and solicited subscriptions and advocated the enterprise. He framed the subscription paper or prospectus. This he admitted on the stand, though denied in his answer. In fact Dr. Roe swears, and it is manifest from all the circumstances, that he took the defendant into the enterprise mainly to have the benefit of his assistance in this very work of organizing the company and managing the delicate business of procuring the carrying out of the options and the vesting the title in the corporation. These facts show that defendant was a " promoter " of this corporation in any and every sense of that word as used in such connection by either the American or the English jurists. In this capacity of promoter, as well as that of president of and one of the board of directors, he was clearly acting in a fiduciary capacity. He was, in effect, a trustee for the several subscribers to the stock.

*Third.* Although the contract of sale took the form of a contract by defendant as vendor and the complainant as vendee, yet it is manifest that defendant acted therein in the same fiduciary

capacity. He contracted to sell property which he did not own, and agreed to take in payment of it, besides the cash consideration mentioned in the contract, four hundred shares of the stock of the company, which he actually took and held as trustee for the stockholders, and as to so much of the cash as he actually received it must have been known and understood by everybody that he was a mere conduit for that as well as of the title to the land. He paid for the land with the funds of the complainant.

*Fourth.* Another aspect of the case arising out of the prospectus is that he assumed the position of a purchaser jointly with the other subscribers to these lands, and therein acted as the agent of his partners in the enterprise.

*Fifth.* While thus acting in a fiduciary capacity, and in effect as a mere conduit of title, he not only conveyed to the company property at a greater price than he paid to the actual grantors, but he concealed from the company the fact that he had received a greater price than he paid, and even went further, and in effect asserted the contrary to the company by inserting in the deeds to himself a greater price than he paid. Defendant swears that these prices were intentionally arranged so that the sum of the whole should amount to about $80,000. In fact, in all those purchased under the options the consideration was untruly stated at about $200 per acre. Now, when we consider that these deeds were sure, in the ordinary course of business, to come under the inspection of the counsel of the company, already elected, as the minutes show, in the examination of the title to these lands, it seems impossible to look upon that untrue statement of the consideration in these deeds as anything short of a positive assertion by the defendant that he had paid, or rather was obliged to pay, and expected to pay, that much money for those lands.

In this connection the language of the prospectus on the subject of price should be noticed—" this tract of land comprises about four hundred acres at the price of two hundred dollars per acre." This clause was not much commented upon by either counsel at the argument. It was probably introduced for the purpose of having the assent of the subscribers to purchasing at

that price, and such is undoubtedly its effect. But the question remains, purchased from whom at that price? And it is impossible to escape the conviction that it meant that the lands were to be purchased from the present actual owners. This, I conclude, would not, under the circumstances, include Dr. Roe or the defendant as to lands other than those actually owned by the doctor. But I am inclined to the opinion that, like the statement of consideration in the several conveyances, it amounted to an assertion that the amount necessary to be paid was $200 an acre, and that view of similar clauses has been taken by the courts.

*Sixth.* The unexplained erasure in the minutes of March 20th, over which the words "Henry C. Loudenslager" are written, leaves it in doubt whether or not any resolution authorizing a contract between the defendant and the company was ever approved by the board of directors.

The general rules covering dealings between trustees and *cestuis que trustent,* and by the trustee with the trust property, are not open to question. They forbid the retention by a trustee of any secret profit made by him in such dealings. He cannot take and retain any commission or bonus or other profit out of any sales or purchases made for the *cestui que trust. Lew. Trusts 275 et seq.*

The law applicable to this particular class of trustees has recently undergone thorough and careful examination and consideration in this court by the late Vice-Chancellor Green, as reported in *Plaquemines Tropical Fruit Co.* v. *Buck, 7 Dick. Ch. Rep. 219,* and his result is stated at *p. 230,* as follows: "I take the law, applicable to this case, to be that 'no rights, legal or equitable, arise in favor of a corporation in respect of transactions, whether complete or inchoate, merely because entered into in contemplation of the creation of such corporation,' and that it was open to Dr. Buck to buy the property on his own account, for any price he could, with the intention or in the hope of selling it at a higher price to a company to be formed, and, dealing independently, to sell it for such higher price to such company, *so long as he obtained his higher price fairly.*

That would be clearly unobjectionable.  But if he, at the time of his original agreement with White, entered into it on behalf of the future company, under such circumstances that the company, when formed, could say that the purchase made by him was made for the company, or if, at the time the actual purchase was made from White, Dr. Buck was a trustee, officer or agent of the company, he cannot be permitted to make any profit from the sale to the company.  Buck, as the promoter of the corporation, stood in a fiduciary relation to the company as soon as it was organized.  *As such promoter, it was open to him to sell property which he owned to the company, on making full and fair disclosure of his interest and position with respect to that property.*  Not only was such disclosure necessary, but it was incumbent on him, as sole promoter of the company, formed to purchase this specific property, controlling and moulding its organization, to furnish it with an executive or board of directors capable of forming competent and impartial judgment as to the wisdom of the purchase and the price to be paid; *and if he, as such promoter, procured the company to be formed and to be managed in such a way as to transfer from the moneys of the company to himself a certain sum without informing the company of that fact, or, what is the same thing, if he took without such disclosure, to his own use, stock of the company issued for the purchase of property, ostensibly to or for another, he cannot retain the same."*

He then supports his conclusions by citations of authorities and extracts from the judgments of the English jurists.  At *p. 234,* he points out that in determining the true character of the transaction it is always important to inquire whether the party sought to be charged as a trustee originally purchased the property with his own money, or whether he used the funds of the company for that purpose.  If he did use the funds of the company for that purpose, it is a circumstance strongly tending to characterize his position as that of a trustee.

In addition to the authorities cited by Vice-Chancellor Green (*7 Dick. Ch. Rep. 233*), I refer to *Brewster* v. *Hatch, 122 N. Y. 349; South Joplin Land Co.* v. *Case, 104 Mo. 572; Pittsburg*

*Mining Co.* v. *Spooner, 74 Wis. 307; Parker* v. *Nickerson, 112 Mass. 195; Getty* v. *Devlin, 54 N. Y. 403* (at *p. 411*); *S. C., 70 N. Y. 504; Yale Gas Stove Co.* v. *Wilcox, 64 Conn. 104; Porter* v. *Woodruff, 9 Stew. Eq. 174; Lydney and Wigpool Iron Co.* v. *Bird, L. R. 33 Ch. Div. 85 (1886).*

*Brewster* v. *Hatch* was an action by individual stockholders against the promoters of a corporation organized to purchase certain mines held under option by the promoters, much in the same manner as were the lands here by Dr. Roe and defendant. The opinion of the court (*122 N. Y. 362*) refers to and relies upon the fact that the promoters, held by the court to occupy a fiduciary capacity, did not disclose to their *cestuis que trustent* the amount they were to pay for the mines, and that they did not intend to exercise their options unless the company was successfully launched.

*Getty* v. *Devlin* was a case much like the present. Four persons combined and purchased an interest in oil lands at a cost of $30,000 already paid; then, as here, they prepared and circulated a subscription paper, by which the subscribers agreed to pay the amount by each subscribed to purchase the lands in question at $125,000.

The four promoters themselves, as here, subscribed liberally, but concealed the fact from the other subscribers that they were the proprietors, and also concealed the cost to them of the property. In an action by the stockholders against the promoters, the court of appeals of New York held them liable for the profits made. Judge Earl (at *p. 411, 54 N. Y.*) used language applicable to this case. He said: " The subscription paper itself contained, substantially, a representation that the subscribers were to purchase the land in Ohio at a cost of $125,000. It imported a joint adventure for the purchase of lands from persons not subscribers, at the price named, in which all the subscribers were to be interested as purchasers upon the same footing, in proportion to their subscriptions. When the four defendants sent forth this paper with their names subscribed to it, they represented that they would pay the sums by them subscribed for the purchase of the land." And, again (at *p. 412*),

he says: "There is another ground of liability. The sub-
scribers to the paper agreed jointly, and for their mutual benefit
and advantage, to purchase certain lands designated for a price
named. No one of the subscribers could, after this, purchase
the lands for a less price, and compel his associates to allow him
more than he paid. His purchase would inure to the benefit of
all the subscribers."

In *South Joplin Land Co.* v. *Case,* a thoroughly-argued and
well-considered case, the defendants, Case and Redburn, held
options to purchase certain property of one Carter, and pro-
moted a corporation to buy that property at $32,000, whereas
in fact their option compelled them to pay a trifle less than
$30,000. It was held, after a full consideration of the authori-
ties, that Case and Redburn were liable to pay to the corpo-
ration, which was, as here, the plaintiff, the amount of the
profit which they had received. At *p. 581,* in delivering judg-
ment, the court says: "It is argued that the directors finally
consented to take the land and unsold lots at the price of
$32,000 ; that they got all they contracted for, and the company
has no just ground of complaint. They did so consent, but it
was upon the representation that $32,000 was the true con-
sideration paid Carter, and that the notes did not go to Case.
For money and property acquired by Case under these untrue
representations, occupying the position he did, he must account.
What the company might have done had Case made full dis-
closure of his profits we cannot say, nor is it material to inquire.
The argument made by defendants on this question is as bad in
law as it is in morals."

In *Pittsburg Mining Co.* v. *Spooner et al.,* the defendants ob-
tained a right to purchase a mining option for $20,000, and
then proceeded to form a corporation to make the purchase,
representing that the option would cost $90,000, and, having
got stock to the amount of $100,000 subscribed, and the de-
fendants becoming officers of the corporation, purchased the
option nominally for $90,000, paying for it only the $20,000
which it actually cost with the money by them received from the
subscribers, and retaining $70,000 for their own use. It was

held that the company was entitled to recover. The court held that the defendants, acting first as promoters, and afterwards as officers of the corporation, occupied the position of trustees for the stockholders, and could make no profit out of the transaction.

In *Lydney and Wigpool Iron Co.* v. *Bird,* two brothers Bird, the defendants, undertook to make sale of a mineral property for the owners, who were desirous to sell for £90,000, out of which £5,000 might be used for the expenses of promoting a company to purchase the property, leaving £85,000 as the net price. The Birds organized a company to take the property at £100,000, out of which they, the Birds, should receive £10,800 for their profits. An agreement in writing was then made by the owners, with a trustee for the prospective company, to sell to him for £100,000. The Birds them employed a solicitor, who got up the prospectus for the company, which stated that the purchase-price was £100,000. The Birds subscribed to the memorandum of association for fifty shares each of £100. The action was brought to recover £10,800 received by them. Held by the court of appeal that they were promoters, and, as such, liable. In delivering judgment (*p. 92*), Lindley, L. J., said : "James Bird in fact procured the formation of the company. He suggested its formation ; he took an active part in the preparation of its prospectus and memorandum and articles of association, in the appointment of two of its first directors, in the appointment of its secretary, and he procured his own firm to be engaged to conduct the sales of the company at a large commission. He fixed the purchase-money at £100,000, and stipulated for the payment of £10,800 to his own firm; and he procured the payment of that sum by the company, and he was himself a director when the last installments of it were made. He was, in truth, the person who fastened the contract to pay £100,000 on the company without disclosing the fact that his firm were to get £10,800 out of the purchase-money."

Applying to the case in hand the principles thus enunciated, I am unable to perceive how the defendant can escape liability.

Counsel for defendant contended that neither Dr. Roe nor the defendant was, in fact, a promoter of the company, nor did

either of them occupy towards it a fiduciary relation, which rendered it incumbent on them to disclose the terms upon which they were to obtain title to the out lands, and that neither made any untrue representations in the premises.

For reasons already given I am unable to adopt those views. I think they did occupy fiduciary relations, and I also think that the insertion in the deeds to Loudenslager of a greater price than they paid was an untrue assertion.

It was also urged that the circumstance that the title in this case passed through defendant was not a part of the original plan of the defendant and Dr. Roe, but was the result of fortuitous circumstances not connected with the case, and ought not to operate to the prejudice of the defendant. I am inclined to the opinion that the defendant's contention of fact in that respect is correct. But admitting it to be true, the question still remains, how would the case stand if the conveyances from the outside parties had been made to Dr. Roe and by him to the company, and the suit had been against Dr. Roe and the defendant jointly? In that case, it seems to me, that as against the defendant the complainant's right to recover his share of the profit would be quite as clear, if not clearer, than it is under the present state of the case. He would then, as now, still stand in the position of aiding Dr. Roe in making a secret profit out of the company and dividing it with him, and all while he was acting as a trustee of the company. In short, the essence of the transaction would not be changed.

It is further urged that at the last the company dealt with the defendant at arm's length, as with a stranger, and at an agreed price. But this is not true as a matter of fact. The terms of the resolution and of the written contract show, as before observed, that all concerned must have known that defendant was a mere conduit. In the first place, the consideration named was not only the $200 per acre in cash or its equivalent, but also in addition thereto four hundred shares of stock, which defendant took in trust for the stockholders, and actually distributed among them ; and then all the directors must have known that defendant, at the moment of making the contract with him, was

not the actual owner of either of the several tracts. In truth, the title to the Roe tract *was* afterwards acquired and held by him under a written declaration of trust in .favor of the complainant, subject to the payment of the purchase-money. These circumstances render it quite impossible to treat the transaction as a dealing with the defendant at arm's length.

Defendant's counsel took the further ground that an additional value was given to the property by the labor and management of the defendant and Dr. Roe in procuring these several options, and thereby consolidating the several tracts held by different titles in one body ; and that having thus increased the value of the property, and being, in the view of a court of equity, its owners, they were entitled to sell it to a company to be formed at the price they did. And, in this connection, they rely upon the fact that the subscribers to the stock were mainly residents of the neighborhood and. familiar with the land and the situation and entirely competent to judge of its value, and that they must be presumed to have purchased on the strength of their own judgment of the value of the property, and not upon the actual or implied representation of its cost contained in the documentary evidence hereinbefore referred to. But I think the complete answer to that is found in the fact that, occupying a fiduciary capacity, the defendant failed to disclose to his *cestuis que trustent* the fact that the actual cost of the property was less .than that demanded for it. The actual cost was a factor which the purchasers were entitled to know in forming their judgment as to the value of the property, and they were also entitled to judge for themselves as to whether the labor of the defendant and Dr. Roe in procuring these options in point of fact added to their value in the manner and to the extent argued by the defendant's counsel.

The authority mainly relied upon by the defendant is a case cited by Vice-Chancellor Green in the *Plaquemines Case*, namely, *Govers' Case, L. R., 20 Eq. 114 (1875)*; *S. C. on appeal, 1 Ch. Div. 182.* But that case is clearly distinguishable from the one in hand in this respect, that it was not an action brought by a corporation, or by individual stockholders in a corporation, to

Woodbury Heights Land Co. *v.* Loudenslager.

recover from its promoter or president a profit made by him in dealing with the company, but it was a motion by a subscriber to the stock of a corporation against the official liquidator thereof to be relieved from the burden of her subscription, and to that extent diminish the fund to be distributed, and it was based on the ground that a statutory fraud was practiced upon her in the prospectus and in the formation of the company, so that it was, in effect, a suit between creditors of a corporation and its stockholders. The case shows that one Skoines was the owner of a patent. He agreed in writing to sell it to one Mappin for £65,000, to be paid £1,000 in cash and £4,000 within twenty-one days after the allotment of shares in a company to be formed and registered by Mappin for the purpose of working the patent, £15,000 in preferred shares of the company, bearing interest at fifteen per cent. per annum, and £45,000 in fully-paid-up ordinary shares of the company. By the agreement Mappin undertook to form a company. Three months later Mappin entered into an agreement in writing with one Wright, as a trustee for the intended company, to sell the patent to Wright for £125,000, £75,000 in cash and £7,500 two months later, and £45,000 in paid-up shares entitled to a preferential dividend of ten per cent., and £65,000 in deferred shares. The company was formed, and Miss Govers was a subscriber to the stock. It failed and a liquidator was appointed. It does not appear that there was any fraudulent statements in the prospectus. The alleged statutory fraud consisted in suppressing the existence of the contract between Skoines and Mappin. The application to be relieved was based upon the idea that Mappin was a promoter of the company. It was held by Sir James Bacon, V. C., in the court below, that she was not entitled to be relieved, on two grounds—*first*, that the fiduciary relation of a promoter was not established against Mappin, and *second*, if it were established against him, its existence did not affect the contract between the company and the shareholders, and that her remedy was by action against Mappin. The appeal was heard by four judges, viz., Lord-Justices James and Mellish ; Baron Bramwell and Judge Brett (now Lord Esher). It was held

by Lord-Justice James and Baron Bramwell (1) that Mappin was not, when he made the first agreement with the patentee, a promoter, and the omission to specify that agreement in the prospectus was not fraudulent under the statute, and (2) that where the omission to specify any agreement renders the prospectus fraudulent under the statute a shareholder has his remedy against the person making the omission, but cannot, therefore, have his named removed from the list of shareholders. It was held by Lord-Justice Mellish that Mappin was a promoter, and that he ought to have disclosed his agreement to the company, but that the omission so to do did not, under the statute, make the prospectus fraudulent on the part of the company, and that the shareholder therefore could not have his name removed but had his remedy against Mappin. It was held by Mr. Justice Brett that the omission to disclose the first agreement was not a fraud independently of the statute, but that the omission to disclose a contract formerly made by a promoter, and likely to affect the mind of a subscriber for shares, was fraudulent under the statute, and that the remedy of the shareholder was to have her name removed from the list of shareholders.

Lord-Justice Mellish (at *p. 191*) says : " Now I agree that if the contract between Skoines and Mappin is to be looked at as an unconditional contract for the sale of the patent from Skoines to Mappin, the company had no interest in the contract and were not entitled to have its contents disclosed to them. The contract, however, between Skoines and Mappin was a contract, as it appears to me, upon the condition that Mappin should procure the patent to be sold to a company formed for the purpose of working the patent, and if such sale was effected £64,000, partly in money and partly in shares, was to be given to Skoines, and the residue of the price, whether money or shares, was to be retained by Mappin. Now, when the company became the purchaser of the patent—that is to say, when the directors, after the formation of the company, adopted the contract made by Mappin with Wright—Mappin was both a promoter and director of the company. The purchase of the patent by the company, who were the only company then in existence formed for the work-

ing of the patent, enabled him, without the knowledge of the company, to fulfill his contract with Skoines and to earn an enormous profit. It seems to me that there are grounds for con-tending that under these circumstances *Mappin ought not to be considered as the owner of the patent, but only as a person who, by a contract with the owner of the patent, had the disposal of the patent, and in that case he was bound to communicate his con-tract with Skoines to the company, and as he did not do so the company were entitled to the benefit of that contract."*

That language applies here, and commends itself by its clear appreciation of what is equitable and just. Its author had the reputation of being the best lawyer of his day in England. The opinions each show that the decision was influenced by the fact that the question was between Miss Govers and the creditors of the company, and not between the company or Miss Govers and Mappin, and it was conceded by all the judges, and by counsel, that as well the company as the deluded stockholders individu-ally might maintain an action or actions against Mappin, either to recover his profits or the damages which they had sustained by his conduct.

Again, if I am wrong in either or both of the positions above taken, that Roe and the defendant were not the owners in any proper sense of these lands at the organization of the company and were its promoters, and we treat them as actual or potential owners and not promoters, still it seems to me not to follow that they were relieved from the duty, under the circumstances, of making full disclosure to the stockholders of such ownership, That duty arose from their present position as officers of the company, and they are clearly within the canon laid down by Vice-Chancellor Green above quoted, for it is to be observed that the mention of the price of $200 per acre in the prospectus subscribed by the stockholders did not constitute a contract on their part to purchase any lands at that price. The absence of any contractual force in the language so used was conceded at the argument. It was no more than a statement or assertion of the probable cost of the property, and a limit fixed to its price.

Nor is there room to contend, upon the evidence, that the

part conveyed by Dr. Roe was worth so much more by the acre than that held by option and purchased from his neighbors as to make the average cost of the whole plot $200 per acre. No proof was adduced or offered in that direction, and there is nothing in the case to warrant the assumption that the part of Dr. Roe's farm conveyed to the company was any more valuable than that conveyed by his neighbors. The fact that the consideration mentioned in the deed from Dr. Roe to the defendant, which it must be remembered was, in effect, in the view of a court of equity, a conveyance to the complainant, amounted, like the others, to just about $200 per acre, together with the fact that the difference between the price paid to the option-givers and the price received for the same lands from the company, was treated between the doctor and the defendant as profits to be divided equally between them, forbid the idea that the doctor's lands were worth more than his neighbors'. I repeat, then, that I am unable to see how the defendant can escape liability to account to the complainant for the profits which he has made in the transaction in question.

The question whether the complainant's decree should be for the whole profit made in the transaction or for one-half thereof only was not discussed by counsel, and I express no opinion on it.

There may be a reference to ascertain the amount of the profits, and the question as to the amount of the decree may be discussed upon the coming in of the master's report.