Several years ago one Clarence Saunders, of Memphis, Tennessee, "evolved and developed a system of vending merchandise, a system of store records, original advertising methods and matters for use as a part of said system, as well as rules and regulations for its establishment and conduct, and various instrumentalities, and adapted others to be employed to advantage in its operation, and conceived and adopted an original and arbitrary name for said system, to wit, `Piggly Wiggly,' and established stores, and created a business, goodwill and proprietary rights in said name." *Page 470 
The said Saunders sold and assigned to the Piggly Wiggly corporation, a corporation under the laws of Delaware, havits principal office in Memphis, Tennessee (hereinafter called the Memphis Company), "all rights for and within the United States in and to said system, the instrumentalities employed in its operation, the patents and application for patents for invention in, and relating to, said instrumentalities, the business established by him, the good-will belonging to said business and in and to the said trade-name and trade-mark Piggly Wiggly.
On or about February 23d 1922, the defendant, Elwood S. Bartlett, and one James G. Hostutler, purchased of the Memphis Company the right to operate stores under the name Piggly Wiggly,c., in the State of Delaware. The consideration for said license was $1,000, which was paid to the Memphis Company by Elwood S. Bartlett.
The right or license was held by the purchasers in their own names, but for themselves and for one Daniel H. Weissman, in equal shares, one-third to each.
The defendant, Hostutler and Weissman (hereinafter called the incorporators), proceeded to incorporate the complainant company, under the name of "Piggly Wiggly Delaware, Incorporated," which company will hereinafter be called the complainant.
In pursuance of said incorporation the three incorporators, on February 27th, 1922, signed a "subscription to capital stock prior to organization," wherein they subscribed to said stock:
Elwood S. Bartlett, four shares.
Daniel H. Weissman, three shares.
James G. Hostutler, three shares.
On the same day the incorporators signed and acknowledged the certificate of incorporation of the complainant. This certificate was received and filed in the office of the secretary of state of the State of Delaware, on March 1st, 1922, at nine o'clock A.M.
On the 4th day of March, 1922, pursuant to a written waiver of notice signed by the three incorporators, they being *Page 471 
all of the parties named in the certificate of incorporation, and all subscribers to the capital stock met as incorporators and adopted by-laws.
The following action was taken and spread upon the minutes, as follows:
"Fifth, There was presented to the meeting the offer of Elwood S. Bartlett, of Atlantic City, State of New Jersey, and James G. Hostutler, of the city of New York and State of New York, offering to sell and assign to this corporation all of their right, title and interest to and under an agreement between them and Piggly Wiggly Delaware, Incorporated, a corporation of the State of Delaware, dated February 23d 1922, under which the said parties secured the exclusive right to operate in the State of Delaware, the system of vending merchandise, c., owned by said Piggly Wiggly Delaware, Incorporated, under an assignment of license from Clarence Saunders, of Memphis, Tennessee, under a patent owned by him as granted by the commissioner of patents of the United States of America on the 9th day of October, A.D. 1917, as full consideration for fifteen thousand (15,000) shares of the common capital stock of this company without nominal or par value, and upon full consideration it was, upon motion duly made, seconded and unanimously adopted:
"Resolved, That said offer be and the same is hereby approved, and it is recommended to the board of directors of this corporation to accept said offer and to issue said stock in payment for the property mentioned therein, said property to be accepted as full consideration and in full payment for said stock."
The meeting unanimously elected the three incorporators as directors, each receiving ten votes.
At twelve o'clock noon, on said 4th day of March, 1922, the three incorporators met as directors, and, after reading and approving the minutes of the first meeting of the incorporators, elected the following officers:
President, Elwood S. Bartlett.
Vice-president, James G. Hostutler.
Secretary, Daniel H. Weissman.
Treasurer, Elwood S. Bartlett.
The following resolutions were offered and adopted:
"Resolved, That the treasurer be and he hereby is authorized to open a bank account in behalf of the corporation with such banking institutions as he may select.
"Further resolved, That, until otherwise ordered, said bank be and hereby is authorized to make payments from the funds of this corporation *Page 472 
on deposit with it upon and according to the check of this corporation signed by its treasurer.
"Resolved, That this corporation accept the offer of Mr. Elwood S. Bartlett and James G. Hostutler to sell to this corporation the property described in the resolution of the incorporators passed at a meeting held this day recommending the purchase thereof, and the board of directors do hereby adjudge and declare that said property is of the value of the full consideration of fifteen thousand (15,000) shares of the common capital stock of this corporation without nominal or par value, and that the same is necessary for the business of the corporation.
"Further resolved, That the president and treasurer be and they hereby are authorized and directed to issue the full paid capital stock of this corporation to the aggregate amount of fifteen thousand (15,000) shares of the common capital stock of this corporation without nominal or par value to Elwood S. Bartlett and James G. Hostutler, or to such person or persons as they may direct in writing, upon receipt of said assignment as, in the opinion of our general counsel, may be sufficient to secure to this company the rights, hereby purchased, in consideration of said sale."
Up to this point no one other than the three incorporators had any interest whatever in the complainant. Bartlett had personally advanced the money to purchase the license rights, and no subscription to stock had been made by any person other than the three incorporators.
On March 10th, 1922, Bartlett and Hostutler assigned to the complainant all their rights and title, including Weissman's interest, under the agreement with the Memphis Company.
The Memphis Company refusing to acknowledge an assignment, or do business with an assignee, upon Bartlett and Hostutler delivering to it for cancellation their agreement, made, executed and delivered to the complainant its contract No. 4234, conveying for the consideration of one dollar the rights theretofore granted to Bartlett and Hostutler, and which Bartlett and Hostutler had assigned to the complainant.
A campaign was then instituted for the sale of stock. The subscription blanks furnished and used by the incorporators were in the following form: *Page 473 
"The right is reserved to reject subscription should the allotment of stock offered at this price be sold prior to receipt of this subscription.
----------------------------------------------------------------- "SUBSCRIPTION
For Preferred and Common Stock of the Piggly Wiggly Delaware, Inc. Incorporated in Delaware, 4057-59 duPont Building. Phone 1195.
Date __________
"I hereby subscribe for ____ shares of 8% Cumulative PREFERRED STOCK PAR $10.00 and ____ shares COMMON STOCK no par value [all stock fully paid and non-assessable] for which I agree to pay $ ____
----------------------------------------------------------------
"This constitutes the entire contract, Piggly Wiggly, Delaware, Inc., not being bound by any agreement not herein embodied. No delivery of stock shall be made hereunder until the total amount of subscription is paid in cash. Any assignment of this subscription shall carry with it all rights and obligations of the undersigned.
"Name ______________________________ "Address ___________________________ "Representative _______________ City and State _________________
----------------------------------------------------------------
"Responsible only for remittance made payable and received by Piggly Wiggly Delaware, Inc.
----------------------------------------------------------------
"The undersigned hereby acknowledges that he has received of ____ the sum of $ ____, the same being payment of his subscription for ____ shares of the capital stock of PIGGLY WIGGLY DELAWARE, INC.
 "_________________________ "Representative.
"____ 19__"
All moneys arising from the sale of preferred and common stock was received by Bartlett as treasurer of the company, and deposited in the accounts of the company.
The amounts received for the sale of common stock were withdrawn by Bartlett as treasurer of the company by check to his order as trustee. He then deposited these amounts to his credit as trustee of and for the three incorporators. From this account he paid expenses, including commissions, office rent, stenographer, printing, advertising sale of stock, and all other expenses of the sale of both common and preferred *Page 474 
stock, and divided the remainder in approximately equal shares between himself, Hostutler and Weissman.
The sale of the common stock aggregated about $100,000, from which was paid for expenses $51,305, the balance of $48,694.98 remaining was divided between the three, as follows:
To Bartlett, $15,348.24.
To Weissman, $18,028.37.
To Hostutler, $15,318.37.
There were certain additional expenses, which Weissman had paid, or was to pay, which would reduce the amount received and retained by him to approximately the same amount as that received by each of the others.
The bill is filed by the company, and the decree sought for is that the defendant restore to its treasury the amount of money paid into it by purchasers of its common stock, and, subsequently, withdrawn by the defendant.
Counsel for the complainant in his brief says: "We concede that there is respectable authority which denies the right of the corporation in like circumstances to maintain a bill, but there is also respectable authority which upholds the right, and we contend that such is the rule in New Jersey.
It seems sufficient to cite Arnold v. Searing, 78 N.J. Eq.
(at p. 146), and cases there cited.
Vice-Chancellor Green, in Plaquemines Tropical Fruit Co. v.Buck, 52 N.J. Eq. 219 (at p. 230), said:
"I take the law, applicable to this case, to be that `no rights, legal or equitable, arise in favor of a corporation in respect of transactions, whether complete or inchoate, merely because entered into in contemplation of the creation of such corporation,' and that it was open to Dr. Buck to buy the property on his own account, for any price he could, with the intention or in the hope of selling it at a higher price to a company to be formed, and, dealing independently, to sell it for such higher price to such company so long as he obtained his higher price fairly. That would be clearly unobjectionable. But if he, at the time of his original agreement with White, entered into it on behalf of the future company, *Page 475 
under such circumstances that the company, when formed, could say that the purchase made by him was made for the company, or if, at the time the actual purchase was made from White, Dr. Buck was a trustee, officer or agent of the company, he cannot be permitted to make any profit from the sale to the company."
Vice-Chancellor Howell, in Arnold v. Searing, supra, relied upon by the complainant, as being authority which upholds the right of the corporation to maintain the suit, in discussing the form of the suit said (on p. 161):
"As the bill now stands, it is a bill filed by stockholders and by the receivers of the insolvent corporation, in which they attempt to enforce a cause of action which they claim runs to the corporation. In other words, they are prosecuting in the right of the corporation. The defendants assert that the cause of action does not run in favor of the corporation, and that it, as a legal entity, has no interest in the transaction, and that taking the charge against the defendants at its utmost weight the corporation itself has no right or interest in the transaction to be protected.
"The complainant's theory in that case was that `the defendants, while they were holding a fiduciary relationship toward the steel company, took and assisted others to take bonds of the company without consideration, * * * all without the knowledge of the company or the syndicate shareholders, and that the defendants should pay the value of the bonds and stock so taken, and that in this view the right of action accrues in favor of the corporation.'"
The vice-chancellor proceeds: "I take it the doctrine contended for by the complainant on this branch of the case is settled in this state in favor of the complainant."
Vice-Chancellor Howell in the same case quoted the late Chancellor Pitney in Bigelow v. Old Dominion Copper Mining andSmelting Co., 74 N.J. Eq. 457. "In many cases promoters, in anticipation of the formation of the company themselves, buy property in order to make it over to the company upon formation. Whether the company in such cases is entitled to claim the benefit of the bargain made by *Page 476 
the promoter is often a question of nicety, and may depend uponwhether the promoter buys the property with his own money, or with money that is, in effect, subscribed for the share capital. It may be thus, in effect, subscribed before the formation of the company, as in the case with many syndicates, in which event the promoter may be a trustee with respect to the property for the company thereafter to be formed, on the theory that the property was bought for the company."
The chancellor, in discussing the liability of Mr. Bigelow, states (on p. 496): "But certainly he would be liable as a promoter acting in a fiduciary capacity, if we take Mr. Justice Sheldon's finding as true. The liability of promoters is fully recognized in this state." Plaquemines Tropical Fruit Co. v.Buck, 52 N.J. Eq. 219, 230. This citation is the rule previously stated by me. In that case the court said: "All these facts, in my judgment, give the company the right to say that the purchase originally made was made for it." It was further found in that case that no disclosure of the existing facts were made to the then stockholders or to the directors of whom only three of the gentlemen elected were present.
In Woodbury Heights Land Co. v. Loudenslager, 55 N.J. Eq. 78; 58 N.J. Eq. 556 (at p. 87), Vice-Chancellor Pitney said: "At the time of the transaction none of the directors, except defendant and Dr. Roe, had any knowledge or notice that this profit was made, and, so far as appears, none of the stockholders, except the same gentlemen * * * and two of the grantors to defendant, had any knowledge of it.
"No money was paid by the defendant or Dr. Roe, or either of them, to the vendors at the delivery of their several deeds. The consideration actually paid went from the corporation through the hands of defendant to the several vendors or their creditors."
The case of See, Receiver, v. Heppenheimer, 69 N.J. Eq. 36
(at p. 75), the court said: "I cannot hold that the judgment of the directors was an honest one in the proper sense of that word, but I must find that it was exercised directly in *Page 477 
the interest of their friend, Mr. Samuel Untermeyer, and his associates."
In Erlanger v. New Sombrero Phosphate Co., 3 L.R. App. Cas.1218 (at p. 1264), Lord Blackburn said: "My lords, in this suit the plaintiffs being a limited company, and suing as such, can only ask for relief on grounds affecting them in their corporate capacity. If individuals were deceived by misrepresentations a case might exist entitling such individuals to be personally relieved against the consequences of such misrepresentations, but the company would not have any title to be relieved on account of such misrepresentations to individuals, especially if the misrepresentations were made by those who at the time represented the company. All this is clearly stated by Lord Cottenham in your lordship's house in Vigers v. Pike."
Lord Hatherley (at p. 1242) said: "In the first place, the plaintiffs endeavored to set aside this contract on the ground of the persons who sold the property having filled a fiduciary position as actual trustees for the company was formed, and being disentitled to participate in any profit which could be made in the sale in consequence of that trusteeship. The court below, as well as, I believe, all your lordships, have been of opinion that they were in no such sense as that trustees for the company; and that which has been called the syndicate * * * were entitled to hold that purchase as a syndicate, and to deal with it as they thought proper."
Lord Hatherley continued: "Secondly, my lords, it was urged in this case, and upon this point also the court were agreed, that although the purchase so made was not liable to be interfered with on the ground that I have stated as being a purchase made by persons who were trustees for the company, nevertheless, it was liable, if due steps were taken at the proper time, to be impeached upon other grounds disclosed by the bill and sustained by the evidence."
Lord Cottingham's statement in Vigers v. Pike, 8 Cl. F.562, found on p. 647 (8 Eng. Rep. 220, 252), referred to by Lord Hatherley, was: "If any individuals were deceived by *Page 478 
any misrepresentations of the persons so constituting and calling themselves directors of `the West Cork Mining Company,' a case might exist entitling such individuals to be personally relieved against the consequences of such misrepresentations; but the company itself cannot have any title to relief founded upon their own misrepresentations. The bill, indeed, does not charge that the company were deceived, but that the representations were `a fraudulent contrivance to plunder the subscribers to the company.'
"The bill, therefore, more strangely, in stating a case on behalf of the company, complains of acts of the company itself, calculated, as is alleged, to deceive individual subscribers.
"How far the governing body conducted the affairs of the company with integrity and judgment, it is out of place to consider, for beyond all doubt these acts were the acts of the company, and although a case may be supposed, in which the governing body of joint stock company, or the acting partners of a firm, may so unite with a stranger in practicing fraud against the company for whom they act as to entitle the company to interfere and to repudiate such acts, and to ask to be relieved against them, such is not the case as stated upon this bill * * *.
"Against such misrepresentations, if they had been proved, the company as such could have no relief.
"The remedy, if any, must have been sought by those who were not parties to such misrepresentations, but who were deceived and defrauded by them."
A recapitulation of the facts as proven:
Bartlett paid for the license right, granted by the Memphis Company with his own money, and Weissman and he held the same for themselves and Hostutler.
The three incorporated the complainant company after having subscribed for ten shares of stock.
The certificate of incorporation provided for two classes of stock — first, fifteen thousand shares of common stock of no par value, and second, fifteen thousand shares of preferred stock of the par value of ten dollars ($10) per share. *Page 479 
The common stock entitled the holder thereof to vote in the management of the company. The preferred stock provided no such power, except under condition which has not become effective, at least, had not at the time of the acts complained of.
At the time of the first meeting of the incorporators, the three being the only parties interested, with full knowledge of all facts connected with the transaction, agreed that the company should purchase of themselves (Bartlett and Hostutler holding the title) the contract with the Memphis Company, in consideration of the issuance by the company to Bartlett and Hostutler or their nominees of all of the said common stock of no par value.
The same three were elected by themselves as stockholders, as the only directors of the company, and as such directors proceeded to, and did, make the purchase of said contract with the Memphis Company, and did authorize the issuance of said common stock to Bartlett and Hostutler or their nominees.
By assignment and order of Bartlett and his associates, the Memphis Company assigned to the complainant the right theretofore assigned to Bartlett and Hostutler, and by them canceled for the nominal consideration of one dollar. The real consideration being the cancellation by Bartlett of the agreement, for which he had paid $1,000.
At that time the corporation had no other assets whatever, and as the common stock had no par value, each share therefore only represented in value one-fifteen thousandths of the assets of the company, and as the company only had assets for which Bartlett paid one thousand dollars ($1,000), there being no evidence whatever that this was an improper amount to pay for the rights purchased, each share could well be said to be worth one-fifteen thousandths of one thousand dollars ($1,000), or six and two-thirds cents ($.06 2/3).
No person other than the three incorporators had any interest in this corporation or its stock or assets, until the first sale of stock to others, which took place after the events before set out. *Page 480 
Bartlett was not a trustee for the company. All the stockholders and directors of the company had full knowledge of all the facts, and he and his associates had received no profit, concealed or otherwise, from the company by reason of the sale of the rights in consideration of the issuance of the stock of no par value. It is unnecessary to now determine what effect, if any, would have resulted had the stock had a par value, and the company had issued stock of more than one thousand dollars ($1,000) face value.
It might well be contended that future subscribers to the stock might have complained, because of the failure to have an independent board of directors, had Bartlett and his associates received from the company a larger sum than had been paid for the contract.
Continuing the recapitulation of the facts proven:
A campaign for the sale of the stock was instituted by the corporation or the three incorporators, agents and salesmen were engaged, forms of subscriptions were prepared, an office opened with clerical force engaged, stationary and other printing and advertising ordered. A reading of the subscription blanks might cause the belief that the company was selling both the preferred and the common stock, and the fact was that Bartlett, as treasurer, handled the funds as though the preferred stock was treasury stock, as it was, and the common stock was the property of himself and his associates, as it was under the statements of facts proven.
The money received from the sale of the common stock, as well as that from the sale of preferred stock, was deposited in the funds of the company.
That received from the sale of preferred stock was retained in the funds of the corporation, and no complaint is made as to any withdrawals, or payments made therefrom.
The funds received from the sale of the common stock was withdrawn by Bartlett as treasurer of the company, and deposited by him as trustee for himself and his associates.
From this fund all expenses of the sale of the preferred stock (as well as the common stock), including commissions, expenses of office, and of printing and advertising were paid, *Page 481 
and the balance received divided between the three interested.
There was, approximately, $100,000 received, over $50,000 paid out for expenses and the balance divided.
The preferred stock was sold at par, and the common stock for different amounts per share, ten dollars ($10) per share, however, being the usual amount and the profits Bartlett and his associates received was the difference in the amounts received by him and them, and the amount he paid for the license rights and the other expenses.
Complaint is made that Bartlett had no authority to withdraw the funds after they had been deposited in the accounts of the company. In these proceedings it makes no difference whether he had or had not formal authority from the board of directors, if, in fact, the right to the money or the possession thereof was not in the company, but was in him.
There was a full bona fide consideration for the sale by the company to Bartlett and his associates of the fifteen thousand shares of the capital stock of no par value. Had this stock had a par value, and had stock of par or face value exceeding the value of the rights purchased been issued, a different question would arise.
I find, therefore, that the only case cited and the one relied upon by the complainant (Arnold v. Searing, supra), does not sustain the contention of the complainant, and that the facts in this case are insufficient to sustain an action by the corporation as such against Bartlett.
It is unnecessary to comment upon what the situation might or would be should a purchaser of stock for a bona fide
consideration file a bill alleging fraud.
I will advise a decree dismissing the bill. *Page 482 
[EDITORS' NOTE: THIS PAGE IS BLANK.] *Page 483